**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------
E.K. and M.H., individually and collectively and
on behalf of P.H.,

                Plaintiffs

      -against-

New York City Department of Education,

                Defendant.

-------------------------------------------------------------

**CASE NO.**      **09-CV-3657**
**(LAP)(JCF)**

**PLAINTIFF'S NOTICE OF MOTION FOR SUMMARY JUDGMENT RULE 56.1 STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

      Plaintiffs, by their attorneys Jesse Cole Cutler, Skyer, Castro, Cutler & Gersten, assert that, upon the pleadings hereunder and upon the administrative record, there are no genuine issues to be tried; the material facts are stated below:

      **<u>MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE</u>**

1. P.H., the son of E.K. and M.H., is a minor child who was classified by the Defendant's Committee on Special Education ("CSE") with autism. Exh. 15-1[1]

2. P.H. was evaluated through the Department's Committee on Preschool Special Education ("CPSE") and diagnosed with Pervasive Developmental Disorder ("PDD"). The CPSE mandated that P.H. receive Applied Behavior Analysis ("ABA")[2] services in excess of 35

---

[1] Citations within this document refer to the Exhibits ("Exh") and Transcript ("Tr.") from the administrative record, a certified copy of which is being provided to the Court by the Defendant.

[2] "Applied Behavioral Analysis is the only empirical method approved to teach children with autism." It uses "principles of reinforcement to increase socially acceptable behaviors to a meaningful degree and it also uses consequences and procedures to decrease socially maladaptive behaviors." ABA is a way of structuring the teaching

hours per week, as well as the related services of Occupational Therapy, Speech Therapy, and Physical Therapy. Tr. 642.

3. P.H. received Special Education Itinerant Teacher ("SEIT") services at home in a one to one student to teacher ratio ("1:1") by special education teachers trained in ABA, in addition to his preschool enrollment at the Children's Aid Society. Tr. 644-645.

4. For that school year, P.H. received the related services of Speech Therapy (5 times per week for 60 minute sessions), Occupational Therapy (3 times per week for 60 minute sessions), and Physical Therapy (2 times per week in 60 minute sessions). Ex. 2; 3; 6.

5. The Department's CSE scheduled a meeting ("the meeting") for April 17, 2007 to discuss P.H.'s educational program for the 2007-2008 school year. Tr. 646.

6. The CSE team ("the team") was composed of Giselle Jordan ("Ms. Jordan"), the District Representative who was to head the meeting; William Kent ("Mr. Kent"), P.H.'s SEIT; a School Social Worker; A General Education Teacher; a Special Education Teacher; P.H.'s parents; an additional parent member, and the Director of P.H.'s Preschool. Ms. Jordan also served as the School Psychologist. Ex. 15-2.

7. The parents provided the team with a psycho-educational evaluation and addendum prepared by Dr. David Salsberg ("Dr. Salsberg"); Progress Reports from P.H.'s Speech Therapist, Occupational Therapist, Physical Therapist, and an Educational Progress

---

of material by breaking it down into very small components that are clear to the child. The use of this method of instruction keeps things very clear, precise, and consistent, allowing students with autism to understand the expectation and decrease their frustrations. Tr. 399-401.

Report from P.H.'s SEIT. In addition, the team was provided with a Social History Update, a classroom observation, and a teacher report. Tr. 32-33; Ex. 1, 2, 3, 6, 7, 11, 13.

8. Three of these documents indicate that P.H. was receiving home-based ABA services. Ex. 2-1, 6-1, 14-4.

9. In his report, Dr. Salsberg noted that P.H. "requires continuation of his home-based ABA" with an experienced SEIT in a 1:1 setting. Ex. 13.

10. Ms. Jordan testified that she relied on all aforementioned documents in making her recommendation. Ms. Jordan has never met, observed, or evaluated P.H. Tr. 31-42.

11. Ms. Jordan testified that she did not receive any documentation from the parent prior to the meeting indicating that P.H. had been receiving home-based ABA. Tr. 183.

12. The team did not recommend ABA services, and they did not recommend any 1:1 instruction. Ex. 15

13. Without evaluations or other justification, and without the participation of P.H.'s Speech Therapist, Occupational Therapist, or Physical Therapist, the team reduced P.H.'s related services, and recommended that he receive Speech Therapy, 3 times per week for 30 minutes; Occupational Therapy, 3 times per week for 30 minutes; and Physical Therapy, 2 times per week for 30 minutes. Ex. 15-26.

14. Ms. Jordan arrived at the meeting with a predetermined set of reading and math goals for P.H. based on the belief that he would be entering the first grade. She was informed at the meeting that the student had repeated a year of pre-school, and would actually be entering

kindergarten for that school year. Ms. Jordan did not conduct a review of P.H.'s levels of academic functioning to adjust these goals, but instead, altered the generic goals to read "K" instead of "1st." Tr. 136; Ex. 15.

15. P.H.'s IEP states that he displays "attention seeking behaviors and will also become frustrated in particular circumstances by biting his hand and screaming. Gaps in his social and communication skills can be attributed to these behaviors emerging." Ex. 15-6. It further states that "difficulties were noted in sleeping, responsiveness, semantic and pragmatic components of language, social awareness, and flexibility that negatively impact his functioning." Ex. 15-7

16. No Functional Behavioral Assessment ("FBA")[3] was conducted for P.H. and no Behavior Intervention Plan ("BIP") was implemented.

17. Regarding P.H.'s social and emotional goals, the IEP states that the "counselor will address social and emotional concerns through counseling sessions." Ex. 15-7; 15-26. Ms. Jordan testified that counseling was a "support that [P.H.] needed .... in order to progress" in his "social skills, for pragmatic language skills, functional language. To progress in taking turns, in sharing, in actual play skills." Tr. 156.

18. The team did not recommend counseling as a related service for P.H. Tr. 156.

---

[3] "Functional behavioral assessment" means the process of determining why a student engages in behaviors that impede learning and how the student's behavior relates to the environment. The functional behavioral assessment shall include, but is not limited to, the identification of the problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior (including cognitive and affective factors) and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probably consequences that serve to maintain it. 8 NYCRR Part 200.1(r).

19. Mr. Kent participated at the meeting by telephone. Ms. Jordan testified that "[Billy] spoke a lot about the progress that [P.H.] has made... [P.H.], in the beginning, was disinterested in playing games with his peers. Now, at least – I mean, he would jab this little girl with his fingers." Tr. 77.

20. Ms. Jordan testified that she based her recommendations on information from the reports provided to her, namely, the Speech Progress Report. Ex. 2. She alleged that that report "stresses the fact that he needs a small peer group to practice his pragmatic skills...so this would give him an opportunity to – he needed a small peer group for socialization and for pragmatic language skills to practice and to – play skills so he can promote his interaction, turn-taking, sharing, all of those skills are necessary for social interactions." Tr. 69.

21. The Speech Report relied on at the meeting contains no mention of P.H.'s need for a small peer group, but instead, notes that "[P.H.] does not yet engage in conversation with adults or peers," and that "given a 1:1 ratio and intense intervention, [P.H.] continues to make progress in his speech-language functioning." Ex. 2-4; 2-2.

22. The team developed an IEP at the meeting that recommended placement in a Special Class with a 6:1:1 student to teacher to paraprofessional ratio ("6:1:1"), in a specialized school with related services. Ex. 15-1

23. The parents received a final notice of recommendation ("FNR") on July 13th, 2007, recommending that he attend this special class at P.S. 94 at 15 ("P.S. 15"). Ex. 16.

24. Kay Cook ("Ms. Cook") is a District coach who trains staff at the proposed program in different methodologies, such as TEACCH[4] and ABA. She testified, and Ms. Jordan confirmed, that the proposed class at P.S. 94 uses a TEACCH methodology, and was "within the best practice, so they are utilizing an ABA foundation." Tr. 181-182; 850.

25. Elizabeth Washburn ("Ms. Washburn"), the teacher of the proposed class, testified that she is the only qualified person in the class that can provide ABA instruction, and that she can provide a maximum of 30 minutes of direct 1:1 ABA per day. She testified that the provision of ABA in her classroom is **solely for evaluative purposes, and was not intended as a form of instruction**. Tr. 766-769; 814.

26. Peer reviewed data and scientific research reflect that ABA instruction must be provided at a minimum of 20 to 30 hours per week for a student to receive any educational benefit from the program. Tr. 810; 813-814.

27. Dr. Salsberg testified that ABA is the only empirically proven method of teaching children with autism, and that 30 to 40 hours per week of instruction is the industry standard. Tr. 577; 579-582.

---

[4] TEACCH stands for "Treatment and Education of Autistic and Related Communication Handicapped Children," and was developed at the University of North Carolina in the 1970's as a way to facilitate autonomy in autistic adults. The program was developed before the most recent and significant developments occurred in understanding autistic children. It is not a method of instruction: it was not developed to *teach* language or writing, but to emphasize basic self-care skills to enable autistic persons to function in the workplace. Tr. 187; http://www.teacch.com/; *County Sch. Bd. of Henrico County v. R.T.*, 433 F. Supp.2d 657, 668 (E.D.Va. 2006).

28. For two weeks, the parent attempted to contact the proposed placement to schedule a visit to determine whether the class was appropriate for P.H.. There was no answer at the school building and the parent's messages were not returned. Tr. 655.

29. The parent contacted Ronnie Schuster ("Ms. Schuster"), the principal of a P.S. 94 at 188 ("P.S. 188"), a *different* site than that offered to P.H., and scheduled a visit to that site for August 7, 2007. Tr. 656.

30. Three weeks after receipt of the FNR, the parents were provided with an opportunity to visit P.S. 188. The parents spoke with Ms. Olive, who was to lead the site at P.S. 15. They observed a 6:1:1 class and testified that the teachers in the class "were – literally I saw – it almost seemed like just babysitting." Tr. 658. Ms. Olive informed the parents that the program has books but "they're a bit of a mess." Further, Ms. Olive informed the parents that the mainstreamed children at P.S. 188 "were not particularly welcoming to the special ed. kids." Tr. 559-660.

31. The parent sent an email to Ms. Schuster the next day requesting more information about the proposed program. In her reply, Ms. Schuster confirmed that mainstream and non-mainstream students at the placement were intentionally separated, and that non mainstream students were forced to eat lunch on the 4th or 5th floor instead of the cafeteria. She suggested that the parent speak with Sonia Royster at the CSE to obtain more information about the program. Tr. 660-661.

32. The parent attempted to contact Ms. Royster over the phone. On August 9th, the parents wrote a letter requesting additional information about the recommended class. Ex. C. The parent received no response to this letter. Tr. 661-662.

33. On August 24th, two weeks prior to the start of the school year, the parent visited the CSE and met with Ms. Royster. Ms. Royster told the parent that she could not provide any information on the proposed class. Tr. 664.

34. The parent was unable to visit P.S. 15 until September 20, 2007, nearly two weeks after the start of the school year. He was told that there were two 6:1:1 classrooms at the site. He observed one class taught by Ms. Washburn with four students. Three of those four students were completely non verbal. Two of the students were not toilet trained, and all of the students had behavioral issues. Ms. Washburn told the parent that P.H. was higher functioning than the students in her class and that it was not appropriate for him. Tr. 669-671.

35. Ms. Olive told the parent that the other 6:1:1 class was comprised of 9 and 10 year olds, and would also not be appropriate for him. Tr. 670.

36. The parent testified that the experience was extremely frustrating. "Calls to the CSE were going unreturned. You know, I literally had to camp out there to get any information...I was the only one doing anything." Tr. 667.

37. The parents began to research other options for P.H. in the beginning of August. They contacted the NEST[5] program, among others, and soon after discovered The Brooklyn Autism Center ("BAC"). Tr. 662.

---

[5] ASD Nest program is a public program offered through the NYC Department of Education. It is designed to help higher functioning children with autism, or Asperger's Syndrome, thrive in mainstream settings and in the community. http://schools.nyc.gov

38. BAC is a program for students with autism that provides 1:1 intensive ABA instruction. Jamie Nicklas ("Ms. Nicklas") serves as the Educational Director of BAC. Tr. 398.

39. Ms. Nicklas has a Masters of Science in ABA, and a Bachelor of Psychology. She was employed for ten years at the Lovaas Institute as the clinical supervisor and provided home based consultative services. Tr. 398-399.

40. Ms. Nicklas testified that "Applied Behavioral Analysis is the only empirical method approved to teach children with autism." It uses "principles of reinforcement to increase socially acceptable behaviors to a meaningful degree and it also uses consequences and procedures to decrease socially maladaptive behaviors." ABA is a way of structuring the teaching of material by breaking it down into very small components that are clear to the child. The use of this method of instruction keeps things very clear, precise, and consistent, allowing students with autism to understand the expectation and decrease their frustrations. Tr. 399-401.

41. Ms. Nicklas observed P.H. at his home prior to enrollment. She testified that meeting and evaluating the child is important because a strict ABA program is not appropriate for every single child and she will not accept a child into the program that may be too high functioning. Ms. Nicklas felt strongly that P.H. needed a strict ABA program. Tr. 414-416.

42. The parents signed a contract with BAC on August 17th, 2007. Ex. 20. The tuition for BAC is $80,000, and the enrollment contract states that all monies are fully refundable if an appropriate public school placement is offered, and accepted prior to September 10th. Tr. 66.

43. The Department did not offer P.H. an appropriate placement for the 2007-2008 academic year. Tr. 559-660; 669-671; 766-769; 810; 813-814; Impartial Hearing Case No. 113216.

44. Prior to his enrollment at BAC, P.H.'s academic skills were limited. Although he was able to read some sight words, he had no reading comprehension. His regular diet contained no protein, and Ms. Nicklas reported that he had not grown for a full year. He was unable to walk outside without exhibiting socially stigmatizing behaviors. Tr. 412; 416-417; 430.

45. Upon enrollment at BAC, P.H. was analyzed and his problem areas were identified. From this assessment, Ms. Nicklas developed a program for P.H. based on the most significant behaviors that needed to be addressed. The program was tailored specifically to meet his needs. Tr. 420-421.

46. P.H.'s school day begins at 9:00 a.m. and ends at 3:00 p.m. P.H.'s teachers rotate every 30 minutes throughout the day to facilitate generalization of skills across all areas. Data is collected by P.H.'s instructors throughout the school day, and  is reviewed and analyzed so that the program can be modified as P.H. continues to meet his goals. Tr. 410; 421-422; 424-427; 529-530; 536-537.

47. Behavior modifications were designed to address walking appropriately outside. They focused on reducing the inappropriate behaviors by five feet at a time. Ms. Nicklas testified that P.H. is now able to walk quietly for one full block. Tr. 430-431.

48. A dietary "novel foods program" was developed at BAC for P.H. to desensitize him to such foods as fishsticks, chicken, and peanut butter and jelly sandwiches. The program

allowed P.H. to develop a familiarity with these foods before consuming them. Ms. Nicklas testified that P.H. is now eating these protein rich foods at home with his family. Tr. 424-425.

49. When P.H. demonstrates mastery of a certain skill set, it is given to another teacher to ensure that skills are carried over to other areas. Tr. 422.

50. P.H. made significant progress during the 2007-2008 school year. Tr. 428.

51. On October 30, 2007, Plaintiffs E.K. and M.H. requested a due process hearing, alleging a denial of a FAPE by the Department for the 2007-2008 academic year. Exh. A. Plaintiffs sought a declaration that P.H. had been denied a FAPE by the Department and sought reimbursement for the unilateral placement of P.H. at BAC for the 2007-2008 academic year. *Id*.

52. In an Impartial Hearing lasting eight days between January 30, 2008 and September 5, 2008, the Impartial Hearing Officer ("IHO") heard testimony and accepted evidence from both parties (IHO Case No. 113216).

53. On October 2, 2008, the IHO rendered a decision properly holding that the Department had denied P.H. a FAPE, and thus granted the Plaintiff's request. *Id*.

54. The Department appealed the Hearing Officer's decision to the New York State Education Department's Office of State Review (Petition, IHO Case No. 113216).

55. The State Review Officer's ("SRO") December 10, 2008 decision inappropriately determined that the Department had offered D.S. the opportunity to obtain a FAPE. Application of the Department of Education, App. No. 08-131.

56. The SRO ignored the weight of the testimony and evidence demonstrating that the recommendations made by the CSE were based on improper assumptions about the proposed site. *Id*.

57. The SRO failed to consider a totality of the circumstances in determining whether the IEP was appropriate, and improperly chose to credit Ms. Jordan's uninformed assumptions about the functioning of the site recommendation. *Id*.

58. Plaintiffs appeal and claim relief from the erroneous December 10, 2008 decision of the SRO. See Complaint.

**WHEREFORE**, there are no genuine issues of fact and the Court is respectfully requested to grant Plaintiff's Motion for Summary Judgment awarding them tuition reimbursement for their placement of P.H. at BAC during the 2007-2008 school year and such other future relief as deemed just and proper.

Submitted by,

DATED: November 2, 2009

_____/s_____
Jesse Cole Cutler, Esq.

Skyer, Castro, Cutler & Gersten
276 Fifth Avenue, Suite 306
New York, NY 10001
(212) 532-9736

13