**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------
M.H. and E.K.., individually and collectively and
on behalf of P.H..,

                        Plaintiffs

    -against-

                                    **CASE NO.**        **09-CV-3657**

New York City Department of Education,                  **(LAP)(JCF)**

                        Defendant

-----------------------------------------------------------------

## MEMORANDUM OF LAW

## IN SUPPORT OF PLAINTIFFS'

## MOTION FOR SUMMARY JUDGMENT


        November 2, 2009                    Jesse Cutler

                                           Skyer, Castro, Cutler & Gersten

                                           276 Fifth Ave., Suite 306

                                           New York, NY 10001

                                           (212) 532-9736

TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………………..ii

STATEMENT OF FACTS…………………………..…………………………………………...2

STANDARD OF REVIEW...................................................................................................3

    I.   Judicial Review of Administrative Decisions…………….....................................…………3

DUE DEFERENCE…………………………………….......................................……………3

ARGUMENT.........................................................................................................................5

    I.   Background on IDEA.......……………………………………...........……………..5

    II. Prong One……………………………………………...........................................5

        A.  Procedural violations........................................................…………………..5

        B.  IEP was not reasonably calculated to yield benefit………………………………11

    III. Prong Two………………………………………………………………………...16

        A.  Unilateral placement at the Brooklyn Autism Center was proper.............................16

CONCLUSION.....................................................................................................................18

# TABLE OF AUTHORITIES

## CASES

*Application of a Child with a Disability*, Appeal No. 08-131............................................9, 11, 16

*Application of a Child with a Disability*, Appeal No. 08-088.......................................................11

*A.Y. v. Cumberland Valley School Dist.*, 569 F. Supp. 496, (M.D.Pa. 2008)............................7

*Bd. of Educ. v. Diamond*, 808 F.2d 987 (3rd Cir. 1986)..................................................................11

*Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982)……………………….…….........………3, 4, 5, 6, 11

*Bd. of Educ. of Kanawha v. Michael M.*, 95 F. Supp.2d 600 (S.D.W.Va. 2000............................11

*Bougades v. Pine Plains Cent. Sch. Dist.*, 2009 WL 2603110........................................................19

*Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186 (2d Cir. 2005)....................................................12

*Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004)............................................9

*Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993)..........................................5, 16, 19

*Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356 (2nd Cir. 2006)………….................3, 17

*Greenwood v. Wissahickon Sch. Dist.*, 571 F. Supp. 2d 654 (E.D.Pa. 2008)................................13

*G.R. v. New York City Dept. of Educ.*, 2009 WL 2432369 (S.D.N.Y.)...................................16, 17

*Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377 (2nd Cir. 2003)....................................................4

*Honig v. Doe*, 484 U.S. 305, 311 (1988).........................................................................................15

*M.S. ex. Rel. S.S. v. Bd. of Educ. of Yonkers*, 231 F.3d 96 (2nd Cir. 2000).......................................3

*Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114 (2nd Cir. 1997)......................................................4

*P. v. Newington*, 546 F.3d 111 (2nd Cir. 2008)................................................................................7

*Pinn ex rel. Steven P. v. Harrison Cent. Sch. Dist.*, 473 F. Supp. 2d 477 (S.D.N.Y. 2007)..........19

*S.H. v. State-Operated School Dist. of City of Newark*, 336 F.3d 260 (3d Cir. 2003)...............5, 15

*Sch. Comm. of Burlington v. Dept. of Educ. of Mass.*, 471 U.S. 359 (1985)...........................5, 18

*Shore Regional H.S. Bd. of Educ. v. P.S.*, 381 F.3d 194 (3d Cir. 2004)............................................16

*T.P. v. Mamaroneck*, 554 F.3d 247 (2nd Cir. 2009)....................................................................19

*Walczak v. Fl. Union Free Sch. Dist.*, 142 F.3d 119 (2nd Cir. 1998)............................3, 4, 11, 16

*Warren G. v. Cumberland Co. Sch. Dist.*, 190 F.3d 80 (3rd Cir. 1999).......................................17

## STATUTES

20 U.S.C. § 1400..............................................................................................................5

20 U.S.C. § 1401[9].........................................................................................................6

20 U.S.C. § 1412[a].......................................................................................................18

20 U.S.C. § 1412[a][5]...................................................................................................17

20 U.S.C. § 1412[a][10][C][ii]......................................................................................18

20 U.S.C. § 1414[c][1]]..................................................................................................7

20 U.S.C. § 1414[d][1][A]............................................................................................11

20 U.S.C. § 1414[d][1][B]..............................................................................................7

20 U.S.C. § 1414[d][1][A][i][IV]................................................................................13

20 U.S.C. § 1414[d][3][A]..............................................................................................7

20 U.S.C. § 1414[d][3][B]..............................................................................................7

20 U.S.C. § 1414[d][3][B][i]..........................................................................................8

20 U.S.C. § 1414[d][4][A][i]..........................................................................................6

20 U.S.C § 1415[c][2][E]..............................................................................................11

20 U.S.C. § 1415[i]...................................................................................................................18

20 U.S.C. § 1415[i][2]……………………………….............…………………………………3

8 NYCRR § 200.4[d][2][i]...........................................................................................................6

8 NYCRR § 200.4[d][2][iii].........................................................................................................6

8 NYCRR § 200.4[d][2][iv].........................................................................................................6

34 C.F.R. §300.26[b][3]............................................................................................................13

34 C.F.R. §300.116(b)...............................................................................................................15

34 C.F.R. § 300.320[a][1]............................................................................................................6

34 C.F.R. § 300.320[a][2]............................................................................................................6

34 C.F.R. § 300.320[a][4]............................................................................................................6

34 C.F.R. § 300.403[c].............................................................................................................18

34 C.F.R. § 300.512[b]……........................................................................…………….3

34 C.F.R. § 550[b]...................................................................................................................17

N.Y. Educ. Law § 4404[1][c]......................................................................................................5

## STATEMENT OF FACTS

Plaintiffs contend that the 2007-2008 IEP was procedurally and substantively inappropriate, and that they are entitled as a matter of law to tuition reimbursement for their unilateral placement of P.H. at the Brooklyn Autism Center. They assert that the record at the Impartial Hearing overwhelmingly demonstrated that P.H.'s severe disabilities and unique needs made it impossible for him to receive any educational benefit from the Department's recommended program; that their unilateral placement conferred a benefit to him; and that equitable considerations tipped in their favor. The Impartial Hearing Officer ruled in favor of the parents.

P.H. was diagnosed with autism and mandated by the Department to receive, at the preschool level, 35 hours of SEIT services by instructors who were trained in, and utilized, ABA instruction in a 1:1 setting. ABA instruction had proven to be most effective in treating P.H. Upon information and belief, New York City received funds from the State Education Department for the provision of this program.

In preparation for a school aged CSE meeting to develop a new IEP for P.H., the parents provided the team with current Psychological Evaluations and Progress Reports from all of P.H.'s Related Service Providers .

The CSE disregarded these evaluations, as well as their own, and recommended a program for P.H. based, not on his individual needs, but on what the Department had to offer. The CSE did not recommend any ABA services, and they did not recommend any 1:1 instruction. Upon information and belief, New York City would not receive State Education Department funding if they recommended an ABA 1:1 program.

The parent visited the recommended classroom and determined that it was inappropriate for P.H. As a result, the parent unilaterally placed P.H. at the Brooklyn Autism Center, a program which is consistent with all of P.H.'s current professional assessments, and where he made progress during the 2007-2008 academic year.

The parents have met the appropriate 2nd Circuit burden for reimbursement of tuition paid to a private school. See *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356 (2nd Cir. 2006).

## STANDARD OF REVIEW

### I.    JUDICIAL REVIEW OF ADMINISTRATIVE DECISIONS

The IDEA permits an aggrieved parent to bring a civil action in district court. In doing so, Congress explicitly mandates the Court to "receive the records of the administrative proceedings, [and] hear additional evidence at the request of a party," and render an independent judgment as to the claims presented. 20 U.S.C. §1415(i)(2); 34 C.F.R.300.512(b).

## DUE DEFERENCE

The Act provides that the Court's decision must be "independent" and justified by a "preponderance of the evidence developed at the administrative proceedings and any further evidence presented by the parties." *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122-23 (2nd Cir. 1998). While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. 176, 206 (1982)); see also *M.S. ex rel. S.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers*, 231 F.3d 96, 102 (2nd Cir. 2000).

In the instant matter, the Complaint does not require a review of any question(s) of educational policy made by the State. The SRO decision hereunder did not turn on a question of educational policy. Rather, the decision turned on a review of the evidence and an arbitrary interpretation and application of law. Although the SRO acknowledged the School District's failure to provide special education and related services in accordance with the child's individual needs, he improperly exempted the District from their obligation to do so. The SRO disregarded the Defendant's arbitrary carryover of the child's annual goals as a "clerical error" and refused to consider the substantive implications of the error. The SRO made an ends-based credibility determination that is otherwise unsupported by the record. The SRO improperly found that the IHO exceeded her jurisdiction by ruling on a matter not raised in Plaintiff's initial complaint, as Defendants opened the door to the matter during oral testimony. These errors do not raise questions requiring any educational expertise, but rather call for the type of judicial intervention and review contemplated by the Act.

The Second Circuit clarified what is to be deemed to be a question of educational policy. See *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377 (2nd Cir. 2003). In *Grim*, the Second Circuit cited itself in *Walczak*, and found that:

> "in order for the District Court to conduct an 'independent' review of the sufficiency of an IEP under the IDEA that does not 'impermissibly meddl [e] in state educational methodology,' it must examine the record for 'any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan.' *Walczak*, 142 F.3d at 130 (citing *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1121 (2nd Cir. 1997) (citing *Rowley*, 458 U.S. at 203)). We noted that such 'objective evidence' is most easily interpreted in the form of grades in mainstream classes, but 'test scores and similar objective criteria' could also be considered." *Grim*, 346 F.3d at 383.

> "…in violation of *Rowley*, the District Court impermissibly chose between

4

the views of conflicting experts on a controversial issue of educational policy –
effective methods of educating dyslexic students – in direct contradiction of the
opinions of state administrative officers who had heard the same evidence, as
prohibited by *Rowley*. See *Rowley*, 458 U.S. at 207 & n.29." *Id.*

There is no review of conflicting opinions. There is no review of which methods are
effective. There is no controversial issue of educational policy. The issue here is whether the
SRO erred in finding that the proposed IEP was developed in accordance with procedural
mandate and whether it was likely to enable P.H. to progress in areas of documented delay. "The
issue of whether an IEP is appropriate is a question of fact." *S.H. v. State-Operated School Dist.
of City of Newark*, 336 F.3d 260, 271 (3d Cir. 2003).

## ARGUMENT

### I.      BACKGROUND ON IDEA

When the parents of a disabled child file suit under the IDEA to challenge a proposed
IEP, and seek reimbursement for the private placement of that child, an award will be entered in
their favor if: (1) the proposed IEP was unable to provide an appropriate public education, and
(2) the private services obtained by the parents were appropriate to meet the child's needs. See
*School Comm. of Burlington v. Dept. of Educ of Mass.*, 471 U.S. 359, 370 (1985); See also
*Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 12-14 (1993) (holding that
reimbursement is proper where prongs (1) and (2) of *Burlington* are satisfied, even where the
parents' private school is not on a state approved list).

Review of the first prong, stated above, requires a two-fold inquiry: the Court must
consider: (1) whether the School District complied with the procedural requirements of the
IDEA; and (2) whether the IEP was "reasonably calculated" to confer educational benefits.
*Rowley*, 458 U.S. at 200; *M.S.*, 231 F. 3d at 102. The School District shoulders the burden of

proof with respect to both of these issues. See N.Y.Educ. Law § 4404(1)(c) as amended by Ch. 583 of the Laws of 2007.

## II.    PRONG 1

### A. PROCEDURAL VIOLATIONS

In the instant case, the IEP was not developed in accordance with the procedural safeguards mandated by the IDEA. The purpose of the IDEA is to ensure that all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs. 20 U.S.C. §1400. The vehicle for the provision of FAPE is the IEP; which is the document containing the individualized education and services that the disabled child is to receive. *Rowley*, 458 U.S. at 181. The IDEA defines FAPE as special education and related services that (1) have been provided at public expense and under public supervision, (2) meet the state's educational standards, (3) include an appropriate preschool, elementary school, or secondary school, and (4) conform with the student's IEP. 20 U.S.C. § 1401(9).

There can be no question that the student here was denied access to a FAPE during the 2007-2008 school year. The IEP team's procedural noncompliance in the instant case was palpable. Despite the team's disregard for procedure, the SRO failed to identify this carelessness, and failed to issue a determination that the student was denied access to meaningful educational benefits, to which he is entitled by law. *Rowley*, 458 U.S. at 192.

The IEP team is responsible for the annual development of the student's IEP. 20 U.S.C. §1414(d)(4)(A)(i). An appropriate educational program begins with an IEP that accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs, and provides for the use of appropriate special education services. 34 C.F.R. §

6

300.320(a)(1), (2) and (4); 8 NYCRR 200.4(d)(2)(i), (iii), and (v). Prior to the development of a child's IEP, the team must review existing evaluation data to determine: the child's present levels of academic functioning and developmental needs, whether the child continues to require special education services, and whether modifications to the existing program must be mandated in order for the child to meet the goals listed in the IEP. 20 U.S.C. §1414(c)(1).

The CSE in the instant case did not base P.H.'s annual goals on his present levels of academic functioning, but instead, arbitrarily predetermined them based on what was believed to be his current grade level. See *P. v. Newington*, 546 F.3d 111, 114 (2nd Cir. 2008) quoting 20 U.S.C. §1414(d)(1)(B) and §1414(d)(3)(A),(B)(holding that "in developing the IEP, the team must consider…the child's strengths, the concerns of the parents, the results of the most recent evaluation of the child… along with other 'special factors' particular to children with certain needs"). Ms. Jordan arrived at the meeting with a predetermined set of reading and math goals for P.H. based on the mistaken belief that he would be entering the first grade. Tr. 136. She was informed at the meeting that the student had repeated a year of pre-school, and would actually be entering kindergarten for the school year at issue. *Id*. Rather than conducting a review of P.H.'s levels of academic functioning to adjust these goals, Ms. Jordan altered them to read "K" instead of "1st." Ex. 15. Despite her admission that P.H.'s reading comprehension levels were "rather low,"she testified that, had P.H. been entering the 1st grade, she would have left the goals unchanged. Tr. 140. Given Ms. Jordan's oversight, it would appear that the team paid little, if any, attention to P.H.'s present levels of performance prior to the meeting.  It should be further noted that Ms. Jordan had never met, observed, or evaluated P.H. prior to the meeting, and therefore had no independent support for the sufficiency of the pre-written goals other than P.H.'s suspected grade level. Tr. 31-32; 120; See *A.Y. v. Cumberland Valley School Dist.*, 569 F.

Supp. 2d 496, 509 (M.D.Pa. 2008) (holding that where goals and objectives are so generic that they could apply to almost any child, they are not specific and can deny a student of a FAPE).

The CSE failed to conduct a Functional Behavioral Assessment to address P.H.'s injurious behaviors. Ex. 15. The Act states that, "in the case of a child whose behavior impedes the child's learning or that of others, [the team shall] consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i). P.H.'s IEP states that P.H. shows "attention seeking behaviors and will also become frustrated in particular circumstances by biting his hand and screaming. Gaps in his social and communication skills can be attributed to these behaviors emerging." Ex. 15-6. It further states that "difficulties were noted in sleeping, responsiveness, semantic and pragmatic components of language, social awareness, and flexibility that negatively impact his functioning." Ex. 15-7 Despite these reports, no FBA was conducted and no BIP was implemented. Ms. Jordan testified at hearing that she did not develop a BIP for P.H. because "he didn't need one." Tr. 81. She stated that the behaviors he was manifesting were "actually very passive, non-responsive, you know, laughing or giggling, but they weren't interfering with his learning....He wasn't manifesting any maladaptive behaviors." *Id.* Whether the failure to create an FBA was based on an oversight or intentional disregard, Ms. Jordan's testimony is in direct conflict with the IEP document that she created. Ex. 15.

If, in fact, P.H.'s behaviors had been assessed and were found *not* to impede his learning, the IEP nevertheless could not have addressed his social and emotional needs. Indeed, that IEP noted that the "counselor will address social and emotional concerns through counseling sessions," but failed to implement the related service of counseling. Ex. 15-7; 15-26. Ms. Jordan testified at hearing that she thought counseling was a "support that [P.H.] needed .... in order to

progress" in his "social skills, for pragmatic language skills, functional language. To progress in taking turns, in sharing, in actual play skills." Tr. 156. Ms. Jordan did not implement the related service of counseling on P.H.'s IEP. *Id.* The SRO's decision noted the absence of counseling as a related service on the IEP, but dismissed the issue as it was not included in Plaintiff's initial due process complaint. Application of the Department of Education, App. No. 08-131, FN 10. The SRO's inclusion of the footnote makes clear that if a *de novo* review had been conducted, the CSE's omission of counseling as a service would have resulted in a determination of a denial of FAPE. To be sure, the CSE failed to mandate a service recommended by its own IEP. Ex. 15.

The CSE failed to attend the meeting with an open mind, and instead, disregarded all evaluations and recommendations that were not in line with its predetermined program, mandating instead its "usual and customary" program for autistic children. A student is deprived of a FAPE when the School District fails to convene an IEP meeting with an "open mind," instead predetermining the nature of services to be offered to a student, even when an IEP meeting is held to "listen" to the concerns of a parent. See *Deal v. Hamilton County Board of Education*, 392 F. 3d 840 (6th Cir. 2004). Prior to the meeting, the CSE received progress reports from all of P.H.'s related service providers. Tr. 69-73. P.H.'s Speech and Language provider reported that:

> "Given the severity of [P.H.'s] delays, as well as his significant progress since therapy began, it is recommended that [P.H.] continue to receive speech and language therapy to focus on improving his pragmatic language skills, increasing his receptive language skills and attention to verbal information, increasing his expressive language skills, and decreasing problem behaviors," and that "given a 1:1 ratio and intense intervention, [P.H.] continues to make progress in his speech and language functioning." Ex. 2-4; 2-2.

The team reduced P.H.'s Speech and Language services by 70%. P.H.'s Occupational Therapy progress report recommended that "[P.H.'s] mandate for OT services continue at 3X60 minutes

9

in a 1:1 ratio" because of his "severe communication deficits, poor regulatory behaviors and

sensory regulatory challenges that interfere with his ability to engage readily in a learning

process to acquire needed skills for academic and social engagement." Ex. 3-2. The team

reduced P.H.'s OT services by 50%. Ex. 15-26. P.H.'s Physical Therapy progress report advised

that "It is recommended that [P.H.] continue his physical therapy sessions at his current

frequency, duration, and group size to ensure progress with the skills in which he continues to

exhibit difficulty." Ex. 6-3. The team reduced P.H.'s PT services by 50%.

     Ms. Jordan testified at hearing that she modified all of the related services because P.H.

was entering a kindergarten program and would now be receiving in the classroom what he was

receiving in a 1:1 setting. Tr. 68. She testified that she based the modifications on information

from the reports provided to her. Tr. 69. Specifically, she claimed that the speech report:

> "stresses the fact that he needs a small peer group to practice his pragmatic skills...so this
> would give him an opportunity to – he needed a small peer group for socialization and for
> pragmatic language skills to practice and to – play skills so he can promote his
> interaction, turn-taking, sharing, all of those skills are necessary for social interactions."
> *Id.*

In fact, the speech report contains no mention of P.H.'s need for a small peer group, but instead,

notes that "[P.H.] does not yet engage in conversation with adults or peers," and that "given a 1:1

ratio and intense intervention, [P.H.] continues to make progress in his speech-language

functioning." Ex. 2-4; 2-2. Ms. Jordan's testimony reflects that she relied heavily on the opinions

of William Kent, the part time SEIT, in making her related service recommendations. Tr. 77-79.

Mr. Kent participated at the meeting by phone, and Ms. Jordan testified that "[Billy] spoke a lot

about the progress that [P.H.] has made... [P.H.], in the beginning, was disinterested in playing

games with his peers. Now, at least – I mean, he would jab this little girl with his fingers." Tr.

77. Based on these observations, Mr. Kent believed, and Ms. Jordan concurred, that P.H. should have access to typically developing peers in a small group setting. *Id.* In making her related service modifications, Ms. Jordan ignored the recommendations of all of P.H.'s then-current providers. Tr. 68-79. The CSE's carelessness in developing P.H.'s IEP evidences an extreme indifference toward P.H.'s education, and has resulted in a denial of FAPE.

## B. IEP WAS NOT REASONABLY CALCULATED TO YIELD BENEFIT

An IEP is reasonably calculated to enable the child to receive educational benefit if it is likely to produce progress, not regression or trivial educational advancement. See *Rowley*, 458 U.S. at 207; see also *Board of Educ. v. Diamond*, 808 F.2d 987, 991 (3rd Cir. 1986). The Court must examine the record for "any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan." *Walczak*, 142 F.3d at 130. Such evidence is most easily interpreted in the form of grades in mainstream classes, but "test scores and similar objective criteria" can also be considered. *Id.* The Department must show that the IEP contains all elements required by the Act, and that the methodology employed by the team was reasonably tailored to meet all annual goals and objectives contained therein. See 20 U.S.C. 1414(d)(1)(a); *Bd. of Educ. of Kanawha v. Michael M.*, 95 F. Supp.2d 600, 610 (S.D.W.Va. 2000).

The proposed program was not tailored to enable P.H. to receive educational benefits. The SRO erred in finding that the IHO exceeded her jurisdiction by ruling on a matter not within the Plaintiff's initial due process complaint, because the Department opened the door to the issue of methodology at the Impartial Hearing. See Application of the Department of Education, Appeal No. 08-131. The IDEA states that a party cannot raise an issue at hearing that was not raised in the due process complaint unless the complaint is amended, but where that issue is raised by the opposing party and fully explored on direct and cross examination, the substance of

11

that issue is properly before the IHO. 20 U.S.C. § 1415(c)(2)(E); Application of a Student with a Disability, Appeal No. 08-088. In the instant case, the Department's counsel inquired from Ms. Jordan on direct examination: "Now what is your understanding of what types of methodologies are used for students? How is that determined?" Tr. 180. Ms. Jordan explained that the TEACCH program is used in the class, and elaborated that the TEACCH methodology is:

> "where they teach to the student's individual needs, and learn new concepts when they're on the one on one, and then they take those one on one concepts that are being taught, and then they come together as a group. So yes, there is a lot of individualized one on one, and there's also generalization of those skills to a group situation, so - - to give the youngster practices in generalizing so skills that they're teaching across various settings, contexts, people, material." Tr. 181-182.

On re-cross, Ms. Jordan explained that when TEACCH was developed in the 1970's " it was more groups - - a lot of developmental disorders were grouped globally, and now were all become very, very, very specialized." Tr. 187. The Department offered the additional testimony of Ms. Cook regarding her opinion on the effectiveness of the TEACCH method versus that of ABA. Tr. 850-866; 873-881. Ms. Washburn further testified as to how each methodology was implemented in the classroom. Tr. 766-780; 813-814. She testified that she is the only qualified person in the class that can provide ABA instruction, that she can provide a maximum of 30 minutes of direct 1:1 ABA per day, and the provision of ABA is solely for evaluative purposes, and was not intended as a form of instruction. Tr. 766-769; 814. She admitted that, based on peer reviewed data and scientific research that she was aware of, students require a minimum of 20 to 30 hours per week of 1:1 ABA to receive any educational benefit from the method. Tr. 810; 813-814. The record indicates that the Department opened the door to the issue of methodology, and the issue was thoroughly developed on both direct and cross-examination. Tr. 766-780; 813-814; 850-866; 873-881. The IHO properly found that the Department had denied P.H. of a FAPE based, in part, on evidence of methodology in the proposed class. Impartial Hearing Case No.

12

113216 at 16. With regard to the issue of methodology, the Court should defer to the Decision of the IHO. See *Cerra v. Pawling Cent. School Dist.*, 427 F. 3d 186, 191 (2nd Cir. 2005) (noting that, in reviewing administrative decisions, the IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy).

The CSE's program recommendation was not specially designed to meet P.H.'s educational needs. Specially designed instruction is defined as "adapting, as appropriate to the needs of an eligible child, the content, methodology, or delivery of instruction. 34 C.F.R. § 300.26(b)(3). The IDEA requires that the IEP include a "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child" 20 U.S.C. § 1414 (d)(1)(A)(i)(IV).

Ms. Jordan testified that to her knowledge, the recommended program uses a TEACCH methodology. Tr. 182. Dr. Salsberg recommended continuation of P.H.'s home-based ABA, as well as 1:1 intensive language-based behavioral interventions by an experienced SEIT throughout the day. Ex. 13. He testified at hearing that he is familiar with TEACCH, but that ABA is the most effective methodology to use with autistic children. He confirmed that 30 to 40 hours per week is necessary for a student to receive an educational benefit. Tr. 577; 579-582. A methodology is not a proper component of a student's IEP where it is not scientifically valid in treating a particular disorder, and where, due to a child's distractibility, it would cause the child to lose ground. *Greenwood v. Wissahickon Sch. Dist.*, 571 F. Supp. 2d 654, 662 (E.D.Pa. 2008) Dr. Salsberg testified that because P.H.'s behavior and attention are so self-directed, he would not attend to a TEACCH program for more than fleeting seconds. Tr. 602. Due to P.H.'s attentional issues, the TEACCH program would effectively work against him. Tr. 602-603.

Despite the recommendations of Dr. Salsberg, Mr. Kent, and all service providers working with P.H., the team did not recommend any 1:1 ABA for P.H. Ex. 15. Ms. Jordan alleged that she did not receive any documentation from the parent prior to the meeting indicating that P.H. had been receiving home-based ABA. Tr. 183. In fact, the record shows that, of the progress reports allegedly relied on at the meeting, those for Speech Therapy, Physical Therapy, and the Department's own Social History Update indicate that P.H. was receiving home-based ABA. Ex. 2-1; 6-1; 14-4. It is unlikely that a thorough review of P.H.'s evaluations and assessments was conducted.

The team's recommendation was inappropriate as evidenced by the parent's visit to and observation of the proposed class. On July 13th 2007, the parents received a final notice of recommendation from the Department, which recommended a 6:1:1 special class at P.S. 15. Ex. 16. For the next two weeks, the parent attempted to contact the school to schedule a visit. Tr. 655. As the school was not open during the summer, the parents were permitted to visit a similar program at P.S. 188 during the first week in August. Tr. 657. At that visit, the parents spoke with Ms. Olive, who was to head the site at P.S. 15. Tr. 657-658. The parents observed that the students in the proposed class were very low functioning with little expressive language, and serious behavioral difficulties requiring physical restraint by the para. Tr. 658. The parents saw very little educational instruction, and likened the class to a daycare facility. Tr. 658-659. Ms. Olive showed the parents a sample of books used for the program and noted that "Well we do have these books but they're a bit of a mess." Tr. 658-659. During the visit, Ms. Olive informed the parents that the mainstreamed children "were not particularly welcoming to the special ed. kids," a statement confirmed by Ms. Schuster in a subsequent email. Tr. 660. Ms. Schuster explained that students in the 6:1:1 class are kept away from mainstreamed children, and are

forced to eat lunch on the fourth or fifth floor instead of the cafeteria. Tr. 660. A separate

entrance to the building was also implemented for non-mainstreamed students . *Id.* Ms. Jordan

testified that she had recommended the 6:1:1 program for P.H. under the impression that he

would have access to mainstreamed students. Tr. 171-172. Specifically, she alleged that in the

lunchroom "he would be right there. I mean, I don't think he would actually—he would be, like,

in one table with his class, and perhaps the table right next to him or two down would be

typically developing peers." Tr. 127-128. Ms. Jordan testified that her recommendation was

based mainly on Mr. Kent's opinion that P.H. should have access to typically developing peers.

Tr. 77. The parents' visit confirmed that the proposed program could not provide this access. Tr.

657-664. The team's recommendation was based on a misconception about the makeup of the

program and was therefore inappropriate for P.H.

> Section 300.116(b) of the Federal Regulations implementing the IDEA states that:
>
> In determining the educational placement of a child with a disability.... each
> public agency must ensure that... (b) the child's placement (1) [i]s determined
> at least annually; *(2) [i]s based upon the child's IEP*; and (3)[i]s as close as
> possible to the child's home.

Congress intended the IEP to serve as the centerpiece of the IDEA. *Honig v. Doe*, 484 U.S. 305,

311 (1988). The IEP is a critical document for a school district, outlining its obligations with

respect to each disabled child. It is that document which guides the parties in understanding the

services that must be provided to the student throughout the school year. The SRO erred in

reversing the IHO's finding of a denial of FAPE because the issue of whether an IEP is

appropriate is a question of fact. *S.H.*, 336 F.3d at 271. Ms. Jordan developed P.H.'s IEP based

on assumptions about the 6:1:1 program that he was to attend. Due to Ms. Jordan's

misinformation, the program recommendation was illusory because it could not provide the

supports that Ms. Jordan testified P.H. required. Tr. 77; 156. The SRO relied on Ms. Jordan's

assumptions about the 6:1:1 program – which she testified to at hearing – instead of the program as it actually functioned and was testified to by the parent. The SRO stated that "In regard to the specific class that was recommended, testimony by the district representative reflected that the classroom was a 'very intensive, structured program that [wa]s designed to meet the deficits of autistic children...with highly trained professionals.'" Application of the Department of Education, App. No. 08-131. The SRO chose to credit the testimony of an uninformed witness rather than to look to the totality of the circumstances before him. "A finding of fact is clearly erroneous when, after reviewing the evidence the court is left with a definite and firm conviction that a mistake has been committed." *Shore Regional H.S. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). The Decision of the SRO is not entitled to deference because a review of the evidence will show that a mistake has clearly been made.

## III.     PRONG 2

### A. UNILATERAL PLACEMENT AT THE BROOKLYN AUTISM CENTER WAS PROPER

Once the *Burlington/Carter* test is satisfied, parents are entitled to reimbursement for privately arranged educational services, even where those services do not fully satisfy the state educational agency's standards. See *Walczak*, 142 F.3d at 129 (noting that the holding in *Carter* applies only "where both prongs of [the] *Burlington* test are [otherwise] satisfied"). The Court also held in *Carter* that the placement chosen by the parents need not be certified or approved by the State to qualify for reimbursement. 510 U.S. 7. "Parents 'need not show that a private placement furnishes every special service necessary to maximize their child's potential.' Thus, courts should 'consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs,' and whether it is therefore likely that the child progress, rather than regress, in the alternative school." *G.R. v. New York City Dept. of Educ.*,

16

2009 WL 2432369, at 2 (S.D.N.Y.) (quoting *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364-65 (2nd Cir. 2006)).The test of parental placement is that it is appropriate, not that it is perfect. *Warren G. v. Cumberland Co. Sch. Dist.,* 190 F 3d 80, 84 (3rd Cir. 1999). The parents' placement was appropriate under the *Burlington/Carter* test because BAC was properly designed to allow P.H. to progress. See *G.R.*, 2009 WL 2432369 at 3.

P.H. is receiving instruction at BAC in the least restrictive environment, as required by the IDEA. See 20 U.S.C § 1412(a)(5). The School District must ensure that disabled students are educated with nondisabled students to the maximum extent appropriate, and that any separate schooling occurs only if the nature and severity of the disability requires. 34 C.F.R. §300.550(b). The student in this case is an autistic child who demonstrates significant maladaptive behaviors. Ex. 15. The record demonstrates that, due to the nature and severity of P.H.'s disability, a 1:1 instructional setting *is* the least restrictive environment. Tr. 443-444; 586. BAC is housed in the International Preschool of Brooklyn, a mainstream school. Tr. 445. Students at BAC participate in a music class with ten typically developing peers. Tr. 412-413. They share hallways, entrances, and play time for 45 minutes per day. Tr. 445-446. Indeed, P.H.'s opportunities for mainstreaming are far greater at BAC than in the recommended program, where students in the 6:1:1 class are intentionally isolated from their typically developing peers. Tr. 660.

P.H. receives the related services of Occupational Therapy, Speech and Language Therapy, and Physical Therapy. Ex. 15. The services are administered outside of school where he has access to Sensory and Physical Therapy Gyms. See *G.R.*, 2009 WL 2432369 at 3 (holding that parents are not required to establish that a private placement offers a particular related service in order to prevail on Prong Two). Ms. Nicklas coordinates with P.H.'s related service providers every 6 weeks, on average, to ensure that everyone on P.H.'s team is working together

17

and maintaining consistency in instruction. Tr. 447-448. The offsite administration of these services ensures that P.H. is not pulled out of the classroom for 90 minutes per day to receive them, an unfortunate occurrence which is common practice within the Department.

P.H. is receiving educational benefits at BAC. Tr. 428. Ms. Nicklas testified that the initial focus of P.H.'s program was designed to address those socially stigmatizing behaviors, and those that interfere with his learning. Tr. 430-431. The behavior modifications implemented to address walking outside focused on reducing the maladaptive behaviors five feet at a time. *Id.* Ms. Nicklas testified that P.H. is now able to walk quietly for one full block. *Id.* A dietary "novel foods program" was developed for P.H. to desensitize him to protein rich foods. Tr. 424. The program allowed P.H. to develop a familiarity with these foods before consuming them; a skill which he has now generalized in the home with his family. Tr. 424-425. P.H.'s inappropriate behaviors have decreased, and BAC is constantly evaluating him to determine whether he is responding to the interventions being provided. When P.H. demonstrates mastery of a certain skill set, it is given to another teacher to ensure that skills are carried over to other areas. Tr. 422. P.H. made significant progress at BAC during the 2007-2008 academic year. Tr. 428.

Guidelines for awarding tuition reimbursement are set forth in the IDEA. The Act explicitly states that when a school district has denied a student a FAPE, the student is entitled to appropriate relief in light of the purposes of the IDEA. 20 U.S.C. §1412(a); 20 U.S.C. §1415(i); See *Burlington*, 471 U.S. at 374. The Court is fully authorized to direct the District to reimburse the parents for the cost of a private school placement where they find that the District failed to provide the child with a FAPE in a timely manner prior to enrollment at the private school, and where the private placement is appropriate. 20 U.S.C. §1412(a)(10)(C)(ii); 34 C.F.R. §300.403(c); *Burlington*, 471 U.S. at 370.

18

## CONCLUSION

The December 10, 2008 decision of the SRO is not entitled to deference by the Court because it is unreasoned and unsupported by the record. "Where the state administrative decisions 'implicat[e] educational policies and practices,' *Pinn ex rel. Steven P. v. Harrison Cent. Sch. Dist.*, 473 F. Supp. 2d 477, 482 (S.D.N.Y. 2007), and are 'reasoned and supported by the record,' *T.P. v. Mamaroneck*, 554 F.3d 247, 254 (2nd Cir. 2009), the Court should defer to administrative decisions." *Bougades v. Pine Plains Cent. Sch. Dist.*, 2009 WL 2603110, 4-5 (S.D.N.Y.). Where the SRO's decision does not provide an independent analysis of the adequacy of an IEP, that decision is not entitled to deference. *Bougades*, 2009 WL 2603110 at 11. In the instant matter, the SRO was presented with conflicting testimony with regard to the proposed site, and made an unsupported credibility determination. The SRO's holding is arbitrary and unsupported by the record. *Id*. The decision is therefore not entitled to deference by the Court.

Regarding equitable considerations, the School District opened itself up to liability for tuition reimbursement when its CSE failed to recommend a plan that was likely to result in educational benefit. The U.S. Supreme Court in *Carter* prefaced its review of the equitable considerations by stating that:

> "Public educational authorities who want to avoid reimbursing parents for
> the private education of a disabled child can do one of two things: give a child a
> free appropriate public education in a public setting, or place the child in an
> appropriate private setting of the State's choice. This is IDEA's mandate, and
> school officials who conform to it need not worry about reimbursement claims."
> *Carter*, 510 U.S. at 15-16.

In the instant case, there were no issues or concerns regarding the parents' conduct or timing that interfere with a full reimbursement award.

**Wherefore**, Petitioners respectfully request that this Court grant Plaintiff's Motion for Summary Judgment, revising administrative decisions as erroneous, and awarding full tuition reimbursement for the unilateral placement made during the 2007-2008 school year, as well as that other relief which the Court deems proper.

Dated: November 2, 2009

Submitted by,

_____/s_____

Jesse Cole Cutler, Esq.
Skyer, Castro, Cutler & Gersten
276 Fifth Avenue, Suite 306
New York, NY 10001
Tel: (212) 532-9736