```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
M.H. and E.K., individually and    :
collectively on behalf of P.H.,    :
                                   :
                   Plaintiffs,     :
                                   :
        -against-                  :
                                   :
NEW YORK CITY DEPARTMENT OF        :
EDUCATION,                         :
                                   :
                   Defendant.      :
----------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/10/10

09 Civ. 3657 (LAP)

OPINION AND ORDER

LORETTA A. PRESKA, Chief United States District Judge:

Plaintiffs M.H. and E.K. (collectively "Plaintiffs" or "the Parents") bring this action against the New York City Department of Education (the "DOE") under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. (2006) (the "IDEA"), challenging the DOE's placement of their son as both procedurally and substantively inappropriate and seeking reimbursement of his private-school tuition. The parties have completed a state administrative hearing and an administrative appeal therefrom, and Plaintiffs now seek review of those proceedings in this Court. The parties have filed cross-motions for summary judgment solely on the basis of the record produced in the state administrative proceedings. For the reasons set forth below, Plaintiffs' motion is GRANTED, and the DOE's motion is DENIED.

I.    STATUTORY FRAMEWORK

The facts herein are analyzed in the context of the IDEA

and the federal and New York State regulations that implement

that statute. "Under the IDEA, states receiving federal funds

are required to provide 'all children with disabilities' a 'free

appropriate public education [('FAPE')].'" Gagliardo v.

Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007)

(quoting 20 U.S.C. § 1412(a)(1)(A)); Bd. of Educ. v. Rowley, 458

U.S. 176, 207 (1982)). "To meet these requirements, a school

district's program must provide 'special education and related

services tailored to meet the unique needs of a particular

child, and be reasonably calculated to enable the child to

receive educational benefits." Id. (quoting Walczak v. Florida

Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998)

(internal quotation marks omitted)). "Such services must be

administered according to an [Individualized Education Plan

('IEP')], which school districts must implement annually." Id.

The IEP is "[t]he centerpiece of the IDEA's educational delivery

system." D.D. ex rel. V.D. v. N.Y. City Bd. of Ed., 465 F.3d

503, 507 (2d Cir. 2006). It is "a written statement that 'sets

out the child's present educational performance, establishes

annual and short-term objectives for improvements in that

performance, and describes the specially designed instruction

and services that will enable the child to meet those

2

objectives.'"  Id. at 508 (quoting Honig v. Doe, 484 U.S. 305,
311 (1988)).  "The IEP must provide 'special education and
related services tailored to meet the unique needs of a
particular child, and be reasonably calculated to enable the
child to receive educational benefits.'"  A.D. & M.D. ex rel.
E.D. v. Bd. of Ed., No. 08 Civ. 9424, 2010 WL 447371, at *2
(S.D.N.Y. Feb. 9, 2010) (quoting Gagliardo, 489 F.3d at 107).
Substantively, the IEP must be "likely to produce progress, not
regression, and [must] afford[] the student with an opportunity
greater than mere trivial advancement."  T.P. ex rel. S.P. v.
Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 254 (2d Cir.
2009).

New York "has assigned responsibility for developing
appropriate IEPs to local Committees on Special Education
('CSE'), the members of which are appointed by school boards or
the trustees of school districts."  Gagliardo, 489 F.3d at 107
(quoting Walczak, 142 F.3d at 123).  "In developing a particular
child's IEP, a CSE is required to consider four factors: (1)
academic achievement and learning characteristics, (2) social
development, (3) physical development, and (4) managerial or
behavioral needs."  Id. at 107-08.  "[T]he CSE must also be
mindful of the IDEA's strong preference for 'mainstreaming,' or
educating children with disabilities to the maximum extent
appropriate alongside their non-disabled peers."  Id. at 108.

3

"New York parents who disagree with their child's IEP may challenge it in an 'impartial due process hearing' before an [impartial hearing officer ('IHO')] appointed by the local board of education." Id. (citations omitted). The IHO's decision may be appealed to a State Review Officer ("SRO"), "and the SRO's decision in turn may be challenged in either state or federal court." Id. The district court may "receive the records of the administrative proceedings" and also "hear additional evidence." 20 U.S.C. § 1415(i)(2)(C). It conducts a "modified de novo" review of the administrative proceedings, M.N. v. N.Y. City Dep't of Educ., --- F. Supp. 2d ----, No. 09 Civ. 20, 2010 WL 1244555, at *4 (S.D.N.Y. Mar. 25, 2010), and must base its determination "on the preponderance of the evidence," § 1415(i)(2)(C). The court has "broad authority to grant 'appropriate' relief, including reimbursement for the cost of private special education when a school district fails to provide a FAPE." Forest Grove Sch. Dist. v. T.A., --- U.S. ----, 129 S.Ct. 2484, 2492 (2009); see Sch. Comm. of Burlington v. Dep't of Ed. of Mass., 471 U.S. 359, 369 (1985) (holding that IDEA authorizes reimbursement).

## II.   FACTUAL BACKGROUND

### A.   Introduction

The following facts and allegations are drawn from the witness testimony and documentary evidence submitted to the IHO over eight days between January 30, 2008 and September 5, 2008. P.H., the son of M.H. and E.K., is a boy who was classified by the DOE's CSE as having autism. (Pls' 56.1 Stmt. ¶ 1; DOE's 56.1 Resp. ¶ 1.)[1]  In the year prior to the events at issue, and pursuant to a mandate of the DOE's Committee on Preschool Special Education ("CPSE"), P.H. received Special Education Itinerant Teacher ("SEIT") services in a one-to-one ("1:1") student-teacher ratio in addition to his mainstream preschool enrollment.  (Pls' 56.1 Stmt. ¶¶ 2-3; DOE's 56.1 Resp. ¶¶ 2-3.) The CPSE mandated that P.H.'s SEITs be trained in and provide at least 35 hours per week of services using Applied Behavior Analysis ("ABA") (Pls' 56.1 Stmt. ¶¶ 2-3; DOE's 56.1 Resp. ¶¶ 2-3), an education methodology that "highlights the development and generalization of speech and language, social skills, functional academics, [and] prevocational and daily living

---

[1] "Pls' 56.1 Stmt." refers to Plaintiff's Rule 56.1 Statement of Material Facts Not in Dispute, filed on November 2, 2009 [dkt. no. 13].   "DOE's 56.1 Resp." refers to Defendant's Response to Plaintiffs' Local Rule 56.1 Statement of Facts, filed on January 19, 2010 [dkt. no. 21].

skills,"[2] A.B.A. Methodologies — Methodologies — New York City
Department of Education, http://schools.nyc.gov/Offices/
District75/Departments/Autism/Methodologies/abamethodologies.htm
(last visited May 3, 2010); (Pls' 56.1 Stmt. ¶ 3; DOE's 56.1
Resp. ¶ 3).[3]  Pursuant to the mandate, P.H. also received several
related services each week: five sixty-minute sessions of speech
therapy; three sixty-minute sessions of occupational therapy;
and two sixty-minute sessions of physical therapy.  (Pls' 56.1
Stmt. ¶ 4; DOE's 56.1 Resp. ¶ 4.)

## B.   The CSE Meeting and the IEP

On April 17, 2007, pursuant to the IDEA, the DOE's CSE
convened a team to formulate an Individualized Education Program

---

[2] The parties frequently use the term "ABA" to refer to discrete
trial training.  (See Hr'g Tr. 778:5-7 ("Discre[te] trial is a
part of ABA[;] it's often used as a synonym, but it's not.").)
Discrete trial training is a technique by which teachers use ABA
to educate autistic students.  In discrete trial training,
"[c]omplex goals are broken down into simple elements which can
be taught in repeated trials."  A.B.A. Methodologies —
Methodologies — New York City Department of Education,
http://schools.nyc.gov/Offices/District75/
Departments/Autism/Methodologies/abamethodologies.htm.   This
technique "optimizes the opportunity for correct responses[,]
which are then met with consistent, positive reinforcement.
[It] requires intensive data collection to identify needs and
quantify progress."  Id.

[3] The Court mentions this website only for the purpose of
providing background information to the reader.  The contents of
the website are not relevant to the Court's analysis of the
issues in this case, and neither party offers this website as
evidence.

("IEP") for P.H.'s 2007-08 school year.  (See DOE's 56.1. Stmt.
¶ 2; Pls' 56.1 Resp. ¶ 2.)[4]  The CSE team members included
Giselle Jordan, who was a DOE representative, school
psychologist, and the leader of the meeting; P.H.'s SEIT; a DOE
social worker; a general-education teacher; a special-education
teacher; P.H.'s parents; an additional parent member; and the
director of P.H.'s preschool.  (Pls' 56.1 Stmt. ¶ 6; DOE's 56.1
Resp. ¶ 6.)  As of the meeting, Jordan had been a school
psychologist with the CSE for approximately three years and had
worked as a psychologist for approximately twenty-one years
before that.  (Hr'g Tr. 26:9-27:16.)[5]  She had no training in
either ABA or TEACCH, another special-education methodology.[6]
(Id. at 174:15-175:21.)  As the DOE representative and CSE team
leader, Jordan was ultimately responsible for preparing P.H.'s
IEP.  (See id. at 32:4-11; Finding of Fact and Decision, Case

---

[4] "DOE's 56.1 Stmt." refers to Defendant's Local Rule 56.1
Statement of Material Facts, filed on January 19, 2010 [dkt. no.
19].  "Pls' 56.1 Resp." refers to Plaintiffs' Response to
Statement of Material Facts Not in Dispute, filed on January 26,
2010 [dkt. no. 23].

[5] "Hr'g Tr." refers to the transcript of the Impartial Hearing
dated January 30, 2008 through September 5, 2008 (titled
"Transcripts, Vols. 1-3") and jointly submitted under seal in
this action on January 28, 2010 [see dkt. no. 15].

[6] TEACCH is a methodology that differs from ABA in that "TEACCH
is more striving for independence[, whereas] ABA is actually
acquiring the skill. . . . So [TEACCH students] have already
gained the skill[, but the ABA students] have to be working with
someone" to acquire the skill.  (Hr'g Tr. 384:4-22.)

7

No. 113216, at 15 (Oct. 2, 2008) [hereinafter "IHO Decision"].)
The parents provided the team with certain documents to consider
in developing the IEP: a psycho-educational evaluation and
addendum prepared by Dr. David Salsberg, the director of
pediatric psychology and neuropsychology at New York University
Medical Center (Hr'g Tr. 571:15-17); progress reports from
P.H.'s speech therapist, occupational therapist, and physical
therapist; an educational progress report from the SEIT; a
social history update; a classroom observation report; and a
teacher report.  (Pls' 56.1 Stmt. ¶ 7; DOE's 56.1 Resp. ¶ 7.)
Jordan stated that she had solicited and reviewed all of these
documents for the purpose of creating P.H.'s IEP.  (See Hr'g Tr.
30:3-31:22.)

These documents generally support three conclusions: (1)
the parents and P.H.'s SEIT were satisfied with P.H.'s preschool
placement and wanted him to continue in substantially the same
manner; (2) P.H.'s other evaluators, including the social worker
from the DOE, were less optimistic about his performance in that
setting; and (3) all agreed that P.H. needed more individualized
educational support.  In preschool, P.H. had been "receiv[ing]
12[-]month educational instruction [in a mainstream preschool
class,] occupational therapy, physical therapy, speech/language

therapy, and SEIT support."  (District Ex. 13 at 1.)[7]  The SEIT, who provided in-school support on a 1:1 basis (IHO Decision 13), reported that P.H. had made "substantial progress throughout the year" and recommended that P.H. "be continually exposed to typical peers."  (See District Ex. 11 at 1.)  The parents similarly reported that they were pleased with P.H.'s educational program.  (See District Ex. 14 at 2 ("[P.H.] is doing very well in his . . . mainstream placement and is flourishing with typical peers.  Parents would like to see [P.H.] continue in Kindergarten in a similar milieu.").)  M.H. emphasized in his testimony, however, that Plaintiffs did not think a mainstream placement would have been appropriate "without the [1:1 SEIT] support."  (Hr'g Tr. 650:2-6.)  These statements conflict, at least in part, with the reports written by the other evaluators, who generally thought that P.H. needed more individual support.  P.H.'s preschool teacher, who had long observed P.H.'s interactions with the SEIT and with the rest of his preschool class, indicated that P.H. could not function in a classroom without 1:1 support and could barely do so with that support.  The preschool teacher's answers to questions on her report included the following, for instance:

---

[7] "District Ex." refers to the documentary evidence submitted to the Impartial Hearing Officer by the DOE (titled "District Exhibits") and jointly submitted under seal in this action on January 28, 2010 [see dkt. no. 15].

We have not seen any academic progress.

[P.H.] is unable to grasp many of the skills and concepts the other children his age are working on.

We have not seen much in the way of social progress as far as voluntarily interacting with his classmates. His interactions are usually guided or modeled by his SEITs.

Since September any small amount of progress that has been made was mainly facilitated by his SEITs.

[P.H.] would benefit from a facility with a small class size that has teachers and support staff to accom[m]odate his needs.

From what we have observed in the classroom[, P.H.] is unable to follow simple directions and instructions. Therefore we feel he would not be ready for a Kindergarten curriculum.

[P.H.]'s SEITs usually determine what works best for him and what will motivate him.

Without prompts and reminders from his SEITs[, P.H.] is unable to interact verbally with his classmates.

The classroom setting is not an appropriate place for [P.H.].  His skills and attention span are not on the same level as the other children['s].  He is totally dependent on his SEITs for guidance and direction.

(District Ex. 4 at 1-4.)  The classroom observation report from the DOE social worker confirms in extensive detail that P.H. was highly dependent on his 1:1 SEIT in class.  (See District Ex. 7.)  And Dr. Salsberg's psychological addendum states, inter alia, that

[P.H.]'s difficulties with language, attention and reciprocity impede his ability to function consistently without intense supports. . . . It is imperative that the intensity of [P.H.]'s therapy program not be reduced at this crucial time, as he is

10

> not only in need of these services to make gains, he
> is at significant risk for regression. . . . [H]e
> requires 1:1 intensive language-based behavioral
> interventions by an experienced SEIT throughout the
> day. . . .

(District Ex. 13 at 1.)   The IHO noted the conflict between

these two groups of opinions, stating:

> the teacher report indicated [that P.H.] had not made
> any academic progress and that he needed a more
> structured setting to address his needs.  The teacher
> report was different from what the parents reported in
> the social history.  The parents thought he made
> progress in the mainstream setting and wanted to
> continue in that type of setting.

(IHO Decision 4.)   At the CSE meeting, Jordan not only was

provided with these reports to consider but also had some of the

evaluators available to discuss their reports in greater detail.

(See District Ex. 8 at 1 (identifying the participants in the

CSE meeting).)

The meeting resulted in the creation of P.H.'s IEP.  (Pls'

56.1 Stmt. ¶ 22; DOE's 56.1 Resp. ¶ 22.)   The IEP recommended

that P.H. be placed in a special class with a 6:1:1 student-

teacher-paraprofessional ratio that met in a specialized school

and could provide related services.  (Pls' 56.1 Stmt. ¶ 22;

DOE's 56.1 Resp. ¶ 22.)   Related services each week were to

include two thirty-minute sessions of physical therapy, three

thirty-minute sessions of occupational therapy, and three

thirty-minute sessions of speech and language therapy.  (See

District Ex. 15 at 26.)   Based on the IEP, the DOE offered P.H.

11

a seat in a class at the school P94 at 15 ("P.S. 15"). (Pls'
56.1 Stmt. ¶ 23; DOE's 56.1 Resp. ¶ 23.)

The parties, however, dispute most other facts regarding
this meeting. Plaintiffs, dissatisfied with the CSE's
recommendation, assert that Jordan largely disregarded both the
documentation and the parents' input, resulting in an IEP and a
school placement that did not reflect the information the team
purportedly considered. (See Pls' 56.1 Stmt. ¶¶ 8-22.) First,
according to Plaintiffs, the documents stress that P.H. required
an education using the ABA methodology in a 1:1 ratio. Three
documents do expressly state that P.H. had been receiving ABA
services. (See District Ex. 2 at 1; District Ex. 6 at 1;
District Ex. 14 at 4.) Dr. Salsberg's addendum, for example,
states that P.H.

> requires continuation of a 12-month program to include
> ABA hours, and intensive speech and language therapy
> in addition to [occupational therapy. He] requires a
> minimum of 35-40 hours of services/week to make
> appropriate progress. . . . [H]e requires 1:1
> intensive language-based behavioral interventions by
> an experienced SEIT throughout the day. In addition,
> [P.H.] also requires continuation of his home-based
> ABA . . . .

(District Ex. 13 at 1.) On his cross examination, Dr. Salsberg
stated that he intended the 35-40 hours of ABA to include the
after-school hours at home. (Hr'g Tr. 599:6-14.) Consistent
with these documents, M.H. testified that P.H. had a "very
intensive ABA program" at home while he was in preschool. (Id.

12

at 644:20-645:2.)  Despite these indications, Jordan asserted

that she did not receive any indication that P.H. had been

receiving home-based ABA (Hr'g Tr. 183:21-184:9), and P.H.'s IEP

ultimately mandated neither ABA services nor 1:1 instruction

(Pls' 56.1 Stmt. ¶ 12; see District Ex. 15).  The IEP confirms

that the CSE did not in fact consider either ABA services or 1:1

instruction.  (See District Ex. 15 at 25 (stating that only

general-education, 12:1, and 12:1:1 programs were considered and

rejected).)

Further, Nicklas opined that no methodology other than ABA

is appropriate to treat autistic children because "ABA is the

only program that uses data and has been clinically proven" to

produce educational benefits.  (Hr'g Tr. 477:21-24.)

Specifically with respect to P.H., she stated that the DOE's

proposed 6:1:1 class, which would have employed the TEACCH

methodology, would have been inappropriate because

> the ratio is 6-1-1 and [P.H.] needs a one to one
> instruction.   He  cannot  learn  in  a  small  group
> setting.   He  struggled  to  learn  in  a  dyad.[8]  . . .
> [Additionally,  the  TEACCH  methodology]  was  developed
> primarily  for  children  who  had  slight  learning
> disabilities and mental retardation, not specifically
> for children diagnosed with autism. . . .  [T]here's
> not data collected on a regular basis for each skill.

---

[8] Nicklas defined "dyad" as "one teacher and two students."
(Hr'g Tr. 415:4-5.)  Nicklas also clarified that P.H. was not
learning new skills in a dyad but rather was using dyad
instruction to generalize the skills he had already learned
through 1:1 instruction.  (Id. at 538:21-539:10.)

From my understanding, there's a lot of picture cues
and it's just a group learning environment.

(Id. at 487:5-25.)  She admitted, however, that she has not used

other methods herself; she has only observed their use.  (Id. at

478:5-479:2.)  Further, Nicklas does not have a degree,

certificate, or license in education (id. at 463:7-18), but she

does have a Master of Science degree in Applied Behavior

Analysis from one of only seven programs in the world accredited

through the American Psychological Association.  (Id. at 462:22-

463:6.)  Kay Cook, a District 75 autism coach, testified on

behalf of the DOE that "the research, the literature, and [her]

own experience" indicate that "[t]here is no one methodology"

that works for educating autistic children.  (Id. at 862:22-

863:3.)  Yet Cook acknowledged that the effectiveness of any

particular method, and of a 1:1 ratio, would vary by student.

(See id. at 876:17-877:21.)

Dr. Salsberg testified about how different methodologies

would apply specifically to P.H.  He testified that an ABA

program that includes less than 30-40 hours per week of ABA

instruction is not considered effective for children P.H.'s age.

(See id. at 579:17-19.)  With respect to the potential effect of

using other methods, including TEACCH, to educate P.H., Dr.

Salsberg stated:

[W]hen you have such [] strong behavioral self-
direction and attention issues as [P.H.] did, any time

14

> I've seen a child in a TEAC[C]H classroom, it's been a
> disaster.  It's always needed more one-on-one and it
> was—and almost every time I've seen it for children
> who are [sic] this behavior, we had to pull them out
> and develop a different kind of program. . . .

(Id. at 601:2-9.)  With respect to the potential effect of using

a hybrid TEACCH-ABA method, Dr. Salsberg testified:

> Well what TEAC[C]H does is mostly focusing [sic] on
> the communication by using a lot of visuals.  So you
> have a visual schedule.  You have pictures.  The main
> focus is on the language as opposed to the behavior.
> [P.H.] has the language.  He can label all the
> pictures.  He doesn't need the pictures.  And in fact,
> his attention is so impacted that if you put a visual
> schedule in front of him, he's not going to use it
> unless you're doing something behavioral with him to
> look at it.

(Id. at 601:23-602:8.)  In sum, he stated:

> I believe [other methods] are minimally effective with
> some children on the Spectrum.  But in general, I
> don't—do not feel—when I have a child who's on the
> Autistic Spectrum who is so self directed and
> behavioral, I do not feel that any of the other
> modalities can effect change on those children.

(Id. at 606:14-25.)  Although Cook testified that the P94

program offered by the DOE would have sufficiently met P.H.'s

needs (id. at 868:6-13), the IHO apparently did not credit her

testimony because Cook had little or no personal knowledge of

either P.H. or P.S. 15.  (See IHO Decision 8.)  The IHO noted

that Cook had based her opinion solely on a review of P.H.'s

records (see Hr'g Tr. 868:6-13); Cook had no teaching experience

in New York City (see id. at 882:2-7); Cook did not know whether

she had trained the P.S. 15 teachers in ABA (see id. at 871:16-

872:13); and Cook did not work with P.S. 15 during the 2007-2008 school year, when P.H. would have attended (see id. at 873:7-10).[9]  (See IHO Decision 8.)

Second, the documents Jordan purportedly considered indicate that P.H. required significant related services each week.  The Occupational Therapy Progress Report recommends that P.H.'s "mandate for occupational therapy services continue at 3X60 minutes in a 1:1 ratio" each week.  (District Ex. 3 at 2.) The Physical Therapy Progress Report recommends that P.H. "continue his physical therapy sessions at his current frequency, duration, and group size."  (District Ex. 6 at 3.) And although the Speech and Language Therapy Progress Report does not indicate a recommended duration or frequency (see District Ex. 2 at 4), Dr. Salsberg's Psychological Addendum states the following: "It is imperative that the intensity of [P.H.'s] therapy program not be reduced at this crucial time, as he is not only in need of these services to make gains, he is at significant risk for regression" (District Ex. 13 at 1). Despite these reports, Jordan recommended that all three of P.H.'s therapy programs be reduced by half.  (Pls' 56.1 Stmt. ¶ 13.)  She explained:

> We modified all of the related services because now [P.H.] was entering a school-age program and related

_____

[9] Indeed, Cook testified that she had never actually visited the site of P.H.'s proposed placement.  (Hr'g Tr. 882:12-14.)

16

services are supposed to support the program as
instruction, plus he's going to get a lot of what he
would have been getting on [sic] a one-on-one when he
wasn't in a school-age program within the classroom.
So he'll get to learn . . . what they're working on;
that concept or whatever they're working on. And then
he's got to transfer those skills, which he needs a
group to do, into the classroom across various people,
materials, and different settings.

(Id. at 68:13-24.)

     With respect to speech therapy in particular, Jordan
testified that she reduced P.H.'s amount of therapy based on her
impression that the Speech Therapy Progress Report "stresses the
fact that [P.H.] needs a small peer group to practice his
pragmatic skills." (Hr'g Tr. 69:5-10.) In fact, the Report
contains no mention of P.H.'s requiring a small peer group.
(See District Ex. 2.) Miranda White, P.H.'s speech therapist,
testified that although P.H. gets some benefit from the reduced
speech therapy, his therapy consists mainly of maintaining his
skills; there is not enough time to address all of the annual
goals and short-term objectives set forth in the IEP. (See Hr'g
Tr. 622:18-623:7.)

     Third, P.H.'s IEP states, on a page completed by Jordan
(Hr'g Tr. 155:3-12), that "counselor will address social and
emotional concerns through counseling sessions" (District Ex. 15
at 7). Jordan testified that counseling was a "support that
[P.H.] needed . . . in order to progress" in his "[s]ocial
skills, for pragmatic language skills, functional language. To

17

progress in taking turns, in sharing, in actual play skills."
(Hr'g Tr. 156:15-23.)   Yet the IEP fails to mandate that P.H.
receive counseling as a related service.   (See District Ex. 15
at 26.)

In addition, Jordan prepared her IEP recommendations for
the CSE meeting based on her understanding that P.H. would be
entering first grade.   (Pls' 56.1 Stmt. ¶ 14.)   When informed at
the CSE meeting that P.H. would in fact be entering
kindergarten, Jordan did not review her recommendations to
determine whether they were nevertheless appropriate (id.);
rather, she merely changed the IEP to read "Kindergarten" where
it previously read "1st Grade."   (Id.; District Ex. 15 at 19;
Hr'g Tr. 136:20-25.)   The IHO found it notable that on page 23
of the IEP, "the annual goal[s] for reading comprehension and
math indicate[] the student must meet first grade standards."[10]
(IHO Decision 15.)   Although Jordan testified that this was just
a clerical error (Hr'g Tr. 150:10-14), Nicklas testified that
both the short-term goals and some of the annual goals, which
Jordan did not change, were too advanced for P.H. (Hr'g Tr.
449:11-460:6).

---

[10] The same page of the IEP does set P.H.'s annual goal in
"phonic and word recognition skills" at the kindergarten level.
(District Ex. 15 at 23.)   Neither party, however, argues what
the relevance of this fact may be.

18

Nicklas identified numerous goals on P.H.'s IEP that she considered too advanced.  She testified that the short-term goals "[P.H.] will make a single appropriate attempt to engage peers when prompted" and "[P.H.] will make more than one independent attempt to engage a peer" were inappropriate because, as of Nicklas's testimony on May 1, 2008, P.H. was still "learning how to approach an adult," and adults are easier for autistic children to approach than peers because they do not "give up very easily [like peers do] if he's not gaining their attention."  (Id. at 449:11-450:19.)  She stated that the annual goal "[P.H.] will engage in appropriate outdoor games and activities, for example tag; duck, duck goose[;] and shooting basketball" was inappropriate because, as of May 1, P.H. was only "learning to play independently right now and with a peer. He's at the level of playing parallel[11] . . . . [T]ag is a very complex activity for a child with autism to . . . understand . . . ."  (Id. at 453:10-454:6.)  She stated that the annual goal "[P.H.] will play interactively with others" was inappropriate because "he needs continual prompting to interact with another student and even just to look at that other student to get an exchange.  [P.H.] can't hold a conversation.  You know, he can't reciprocate a minor statement."  (Id. at 455:25-

---

[11] "Parallel play" means that "the two children will sit at the same activity and play, but they won't interact with each other."  (Hr'g Tr. 447:7-11.)

456:4.)  The short-term goal "[P.H.] will engage in socio-dramatic play using a character or activity for five minutes" was inappropriate because P.H. "doesn't stay on task for five minutes."  (Id. at 457:10-13.)  The most he had done with characters by May 1 was imitating things that teachers had done with puppets.  (Id. at 457:14-18.)

    Although Nicklas testified that the annual goal "[P.H.] will improve reading comprehension skills to meet kindergarten grade English language performance standards" was appropriate, the underlying short-term objectives, on her view, were not. (Id. at 457:22-458:6.)  The objectives are as follows:

    1.  He will distinguish between fact and fiction[.]
    2.  He will predict outcomes with 80% accuracy[.]
    3.  He  will  identify  the  effect  of  a  certain action[.]
    4.  He will predict the ending of a story[.]
    5.  He will recognize the difference between fantasy and reality[.]

(District Ex. 15 at 19.)  Nicklas testified:

    [P.H.] at this moment is reading one word.  I would like to start a comprehension program with him.  But I mean, he couldn't comprehend if he read a sentence . . . .  So to be able to distinguish between fact and fiction, predict outcomes and identify the effect of a certain action, I just fee[l] that's . . . above where he is."

(Id. at 458:8-17.)

    The next annual goal states that P.H. "will improve reading skills by improving his phonic and word recognition skills to meet kindergarten grade expectancy."  (Id. at 459:7-9.)  Nicklas

testified that this goal is similarly too advanced.  She

testified:

> I believe that [P.H.] would first need to learn that
> A, the letter A means Ah (phonetic), the letter B
> makes the sound buh (phonetic).  That is not in place
> yet.   So in order for him to be able to recognize
> words with the same beginning sound, I think it's a
> step ahead—prerequisites missing again.

(Id. at 459:12-18.)  The following goal states that P.H. "will

improve mathematics skills to meet kindergarten performance

standards."   (Id. at 459:19-21.)  Nicklas opined:

> [T]his is something that he could do in the near
> future [as of May 1, 2008], but as I mentioned
> earlier, he's just learning how to label numbers.   So
> for him to grasp concepts like before, after, few,
> many, same as, equal, all, every—I think he needs to
> learn how to label numerals first[—]that's more
> important[—]and count as well.

(Id. at 459:24-460:6.)

M.H. testified that although Plaintiffs cooperated with the

CSE by providing all the requested documents regarding P.H.'s

abilities and deficits (Hr'g Tr. 646:14-21), the CSE team

ultimately disregarded the recommendations contained in those

reports in favor of its own predetermined recommendations.   (Id.

at 652:22-653:14.)  He stated:

> I think that the reports that were submitted
> appropriately describe my child, but I think that what
> is on the IEP does not. . . . [T]he goals that they
> say, you know, he'll play basketball for, you know, 15
> minutes at a time or whatever.  God, I would love for
> him to be able to do that, you know.
>
> Would I like for him to meet those goals?
> Absolutely.  But you know that is not my kid.  The kid

21

is reflected in the reports that my therapists submitted to the Board of Education.

(Id. at 653:11-23.) Further, M.H. testified that when he voiced his objections to the DOE's recommendations, "there was just a lot of pushback." (Id. at 651:20-21.) In short, according to M.H., the CSE team rejected all of M.H.'s concerns, which conflicted with its own prepared recommendations. (Id. at 651:20-652:8.)

Finally, according to Plaintiffs, the CSE team failed to conduct a functional behavior assessment ("FBA"), allegedly in violation of its statutory duty under the IDEA and its New York state regulations. The IDEA requires that "in the case of a child whose behavior impedes the child's learning or that of others, [the CSE team shall] consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i). The New York State regulations implementing this provision define a functional behavior assessment as "the process of determining why a student engages in behaviors that impede learning and how the student's behavior relates to the environment." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(r) (2010). The CSE must initiate an FBA if a student's "behavior impedes his or her learning or that of others." § 200.4(b)(v).

P.H.'s IEP states that P.H. shows "attention seeking behaviors and will also become frustrated in particular circumstances by biting his hand and screaming.  Gaps in his social and communication skills can be attributed to these behaviors emerging."  (District Ex. 15 at 6.)  It further states that "difficulties were noted in sleeping, responsiveness, semantic and pragmatic components of language, social awareness, and flexibility that negatively impact his functioning."  (Id. at 7.)  Despite these observations, the CSE did not initiate an FBA.  (Pls' 56.1 Stmt. ¶ 16.)

The DOE tells a different story.  On its view of the facts, the CSE meeting produced an IEP and placement that accurately reflected the information provided to the team.  (See DOE's 56.1 Stmt. ¶¶ 3-12.)  All participants in the meeting had an opportunity to contribute to the process.  (Id. ¶ 8.)

First, according to the DOE, P.H. did not require an FBA because his behaviors did not interfere with his ability to learn.  (Id. ¶ 7.)  Jordan testified that "the behaviors he was manifesting was [sic] actually very passive, non-responsive, you know, laughing or giggling, but they weren't interfering with his learning. . . . He wasn't manifesting any maladaptive behaviors."  (Hr'g Tr. 81:7-15.)  Yet Cruz's testimony at least partially contradicted Jordan's.  When asked whether she "ha[d] experience implementing Functional Behavior Assessments," Cruz

23

answered, "Yes . . . every child's IEP must have an FBA." (Id.
at 258:14-18.) But she added that "if a student arrives without
a Behavior Intervention Plan, . . . the school [might] implement
[its] own." (Id. at 259:6-16.) Cruz further stated, upon
reviewing P.H.'s IEP, "He has difficulties attending to some
activities, and that's where you have negative behaviors at
times; and that's, that's a good clue for teachers to create an
FBA . . . ." (Id. at 310:5-15.)

    Second, Jordan testified that the parents did not voice any
concerns at the CSE meeting. She stated: "There was, I believe,
a good amount of dialogue between all of the committee
participants and everyone had an [sic] ample time to express
their concerns and they were addressed at the meeting. And I
believe that the parents were satisfied at that time." (Id. at
80:1-6.)

    Third, Susan Cruz, the assistant principal of P.S. 15,
testified that the teachers modify students' goals as needed,
based on their interactions in the classroom. (Id. at 275:16-
276:12, 350:4-352:24.) The upshot of this testimony is that
even if the goals set forth in the IEP were substantively
inappropriate for P.H., the teachers at P.S. 15 could modify
them to be substantively appropriate as P.H. progressed through
the academic year; thus, any procedural defect caused by an
improper determination of the goals by the CSE team could be

24

remedied by P.H.'s teachers during the year. (See DOE's Opp'n Mem. 10.)

In any event, the parties agree that on July 11, 2007, the DOE sent Plaintiffs a final notice of recommendation ("FNR") regarding P.H.'s proposed placement. (See District Ex. 16.) The DOE proposed to place P.H. at P.S. 15. (Id.)

## C. The Parents' Investigation of P.H.'s Placement and Unilateral Placement at the Brooklyn Autism Center

Plaintiffs assert, and the DOE disputes, that the following series of events took place. For two weeks after P.H.'s proposed placement, M.H. attempted to contact the school and schedule a visit in order to confirm that the class was in fact appropriate for P.H. (Pls' 56.1 Stmt. ¶ 28.) During that time, M.H. never received an answer, and the school did not return his messages. (Id.) Finally, the DOE informed M.H. that Ronnie Schuster, the principal of a different school, P94 at 188 ("P.S. 188"), would be the principal of P.H.'s program during the 2007- 2008 school year. (See id. ¶ 29; Hr'g Tr. 656:7-16.) M.H. had received no other relevant information from his attempts to contact the DOE. (See Pls' 56.1 Stmt. ¶¶ 28-29.) Therefore, M.H. contacted Schuster and scheduled an August 7, 2007 visit to P.S. 188. (See id. ¶ 29.)

M.H. and E.K. visited as scheduled. (Hr'g Tr. 657:22.)
They met Oliva Cebrian, a teacher who was to lead the site at
P.S. 15, the location of P.H.'s placement. (Pls' 56.1 Stmt.
¶ 30.) Cebrian took M.H. to observe a 6:1:1 summer class
similar to the one P.H. would be entering in the fall. (Id.;
see Hr'g Tr. 660:23-661:6 (noting that "[a]ll the kids were
going to show up on the first day and then" be "sort[ed] out"
"over the course of both sites"—i.e., between P.S. 188 and P.S.
15).) M.H. observed that the teachers in the class "seemed like
[they were] just babysitting." (Pls' 56.1 Stmt. ¶ 30 (quoting
Hr'g Tr. 658:16-17).) Cebrian informed M.H. that the program
has books, but "they're a bit of a mess." (Id. (quoting Hr'g
Tr. 659:1-2).) She also stated that the mainstreamed children
at P.S. 188 "were not particularly welcoming to the special ed.
kids." (Id. (quoting Hr'g Tr. 660:9-11).) All of this gave
M.H. concerns about the appropriateness of P.H.'s placement.
(Hr'g Tr. 659:2-20.)

The next day, M.H. e-mailed Schuster requesting more
information about the P.H.'s placement. (Pls' 56.1 Stmt. ¶ 31.)
In response, Schuster stated that mainstream and non-mainstream
students were intentionally separated. (Id.) She also stated
that non-mainstream students were required to eat lunch on the
4th or 5th floor instead of in the school cafeteria, where the
mainstream students ate. (Id.) Schuster suggested that M.H.

speak with Sonia Royster at the CSE, whose work dealt with
students' placements, to obtain more information about the
program.  (Id.; see Hr'g Tr. 661:11-16.)  M.H. attempted to
contact Royster over the phone and also by letter to request
information about the DOE's placement of P.H.  (Pls' 56.1 Stmt.
¶ 32.)  She did not return any of his communications.  (See id.
¶ 32; Hr'g Tr. 661:19-662:3.)

In the meantime, Plaintiffs had begun to investigate their
own placement options for P.H.  (Hr'g Tr. 662:4-663:23.)  They
"called a program at Nest . . . to see if [P.H. could] have a
SEIT in the class with him there."  (Id. at 662:10-15.)  They
also explored whether a placement at the Brooklyn Autism Center
("BAC") might be appropriate.  (Id. at 662:16-663:23.)  After
touring the BAC and meeting with Jamie Nicklas, its educational
director, Plaintiffs determined that the BAC would be an
appropriate placement for P.H., at least until they found out
more information on the DOE's recommended placement.  (See id.
at 663:24-25.)

M.H. "signed a[n enrollment] contract at BAC."  (Id. at
665:3-4.)  He added:

I . . . only had to put down a small deposit.  And if
I could get placement for the start of the school
year, then I wouldn't be liable for the rest of the
money.  And that really made me kind of amp up.  And
it was probably like August 17th.  It was probably
August 17th, and that made me really ramp up trying to
get an answer out of the CSE between now and then as

27

far as like what his public school placement would be.[12]

(Id. at 665:4-13.)  The contract indicated that P.H. would be enrolled at BAC for an annual tuition of $80,000, payable upon the beginning of P.H.'s term.  (See id. at 500:15-22.) Plaintiffs had the right to withdraw P.H. before September 11 without being liable for the entire $80,000.  (Id. at 501:17- 502:9.)

After signing the BAC contract, Plaintiffs continued to pursue the DOE's recommended placement.  On August 23, M.H. e-mailed Schuster to inform her that they were going to try to place P.H. at the BAC temporarily until the DOE gave them some concrete information on its recommended placement in the public schools.  (Id. at 663:25-664:5.)  The next day, August 24, M.H. visited the CSE office.  (Pls' 56.1 Stmt. ¶ 33.)  After waiting an hour and a half, he was finally able to meet with Royster to discuss P.H.'s placement.  (Id.; Hr'g Tr. 664:5-14.)  Although she worked in placement and although school was scheduled to begin in two weeks, Royster was unable to provide him with any

---

[12] Although the BAC contract is dated July 17, both M.H. and Nicklas testified that the date was a typographical error.  (Id. at 666:12-667:12 ("[The date] is July 17th, but it must be some sort of a typo because we weren't even aware of—that the BAC existed until the beginning of August."); see id. at 500:23- 501:16 (setting forth Nicklas's testimony that the contract and related documents were signed on August 17 despite being dated July 17).)  No evidence suggests either that the August 17 date is fabricated or that the July 17 date is not an error.

28

information regarding P.H.'s recommended class placement. (Pls' 56.1 Stmt. ¶ 33; Hr'g Tr. 664:18-25.) M.H. also met with Martin Bassis, another placement officer, who similarly could not provide a class profile or any other information on P.H.'s placement. (See Hr'g Tr. 664:16-19.) Schuster told M.H. to contact her on September 10, the day when she would be putting together the classes. (Id. at 668:20-22.)

On September 10, the first day of school, M.H. called Schuster as directed. (Id. at 668:24-669:1.) He left a message, but Schuster never returned his call. (Id. at 669:1- 2.) On September 14, M.H. e-mailed Schuster.[13] (Id. at 669:4- 5.) She did not return his e-mail until September 19. (Id. at 669:5-6.) M.H. made an appointment to see the DOE's recommended class placement the next day.[14] (Id. at 669:9-11.)

On September 20, M.H. visited P.S. 15, the DOE's actual placement. (Id. at 669:12-15, 20-21.) He was greeted by Oliva Cebrian, who took him to the classroom of Elizabeth Washburn.

---

[13] Plaintiffs' enrollment contract with BAC indicates that P.H.'s $80,000 tuition became nonrefundable on September 10. (See District Ex. 20 at 5.) Although that would appear to render Plaintiffs' investigation of the DOE placement futile after that date, the IHO's decision suggests that Plaintiff's actions after September 10 weighed equitably in Plaintiffs' favor. (See IHO Decision 13-14, 16.) In any event, M.H.'s investigation after this date is certainly relevant to the substantive appropriateness of the DOE's placement.

[14] Cruz testified that "the school is always open to the parents coming in . . . to actually see what is being implemented in the classroom." (Hr'g Tr. 280:3-7.)

29

(Id. at 669:18-22.)  M.H. spent approximately half an hour
observing Washburn's class.  (Id. at 669:18-23.)  Washburn used
primarily the TEACCH method of instruction.  (Id. at 767:9-18.)
She testified that she used discrete-trial ABA "with students
with whom it's appropriate."  (Id. at 767:9-18.)

M.H.'s observation left him with two kinds of concerns
about this class.  First, he felt that P.H. was developmentally
more advanced than the students in the class.  For example,
"[t]hree of the four kids were completely nonverbal" (id. at
671:3-4), whereas the documents the CSE considered indicated
that P.H was verbal (e.g., District Ex. 1 at 2-3; District Ex.
2); "two of the four were not toilet trained, were wearing
diapers" (Hr'g Tr. 671:4-5), whereas P.H. was toilet trained
(e.g., District Ex. 22 at 2; see also District Exs. 1-14 (not
mentioning any problem with toilet training in documents
provided to the CSE)); and "[t]here was not a lot of attending.
One of the little kids in the class who was not toilet trained
. . . was slumped over, sucking his thumb."  (Hr'g Tr. 671:20-
25.)  Yet the documents offered to the CSE indicated that P.H.
would "benefit from placement with better language and social
models. . . . [H]e [also] requires 1:1 intensive language-based
behavioral interventions by an experienced SEIT throughout the
day."  (E.g., District Ex. 13 at 1; District Ex. 1 at 4-5.)

Second, M.H. was concerned that P.H. would not benefit from the kind of instruction Washburn provided to her class. He explained:

> She was reading some sort of a, like a Dr. Seuss book and was focusing on the words lion and apple. And she had pictures of a lion and a picture of the apple, and all she was trying to do was to get the kids to identify the apple . . . , and they were not even capable of that.

(Hr'g Tr. 671:10-16.) The documents provided to the CSE, however, indicate that P.H. already possessed cognitive skills more advanced than those Washburn was trying to instill. For example, P.H.'s Speech and Language Progress Report states:

> [P.H.] demonstrated the following receptive language skills in a structure, one-on-one setting: recognizing action in pictures, understanding the use of objects, understanding part/whole relationships, understanding simple descriptive concepts such as "wet" and "little," identifying colors, making inferences using pictures, and understanding some picture analogies. . . . Expressively, [P.H.] was able to name pictured objects, tell how an object is used, use quantity concepts, use possessives, complete some analogies[,] and name objects when the object is described.

(District Ex. 2 at 2.)

Following his observation, M.H. spent about fifteen minutes talking to Washburn about "things like where the kids were in the class, where [P.H.] was at, cognitively, expressively, a little bit of his history so that she knew where he was coming from as well." (Hr'g Tr. 670:3-7.) M.H. stated that the school personnel indicated that Washburn's class would also employ the

31

PECS system for P.H., even though P.H. was verbal and even though PECS was used only for non-verbal students like the ones currently in Washburn's class. (Id. at 710:14-712:5; see IHO Decision 14.) Washburn, however, "said that P.H. should be in Jackie's class, another teacher at the school." (Id. at 670:12-13.) She also stated that she only used PECS with her two non-verbal students, not her whole class. (Id. at 774:12-18.) But Oliva Cebrian told M.H. that Jackie's class would not have been appropriate for P.H. because that class had students nearly twice P.H.'s age. (Id. at 670:13-19.) No one at the school indicated either that P.H. could have been placed in any other classroom or that anyone else might have been P.H.'s teacher. (Id. at 674:1-675:2.) M.H. stated: "So I left the school going what do I do?" (Id. at 670:19-20.)

The DOE offers its own version of events. First, it asserts that P.H. would not have been placed in Washburn's class. Instead, the DOE would have placed him in the classroom of Corrine Motta, another P.S. 15 instructor (Hr'g Tr. 252:8-12; see District Ex. 18 at 1), who did not meet with M.H. when he visited P.S. 15. Notably, M.H. gave undisputed testimony that when he visited P.S. 15—after the incoming P94 students had been sorted into their permanent classes—no one either introduced him to Motta or suggested that her class would have been a potential placement for P.H. (See Hr'g Tr. 674:1-675:2.)

32

Rather, the DOE identified the option of Motta's class for the
first time on April 2, 2008, at the Impartial Hearing (see id.)
and, at the time M.H. visited, said that P.H. would have been
placed in Washburn's class (see id.). Although Washburn
testified that she did not recall meeting M.H. (id. at 777:9-
11), she admitted that M.H. may well have visited her classroom
(see id. at 817:20-818:1). The DOE did not call Schuster or
Cebrian to testify that M.H. never visited the school. M.H.'s
testimony on this point therefore stands unrebutted.

In any event, Motta's kindergarten class consisted of three
five-year-old children. (See District Ex. 18 at 2.) All of the
students lacked expressive language skills (id. at 291:18-
292:12; IHO Decision 6) and had below-average intellectual
ability and social skills. (District Ex. 18 at 1-2.) Two of
the three were not toilet trained. (Hr'g Tr. 319:19-320:1.)
Motta used the TEACCH methodology and employed ABA "as needed."
(Id. at 384:2-3.) According to Cruz, ABA instruction is
administered to Motta's students by Motta and occasionally
Cebrian, who pull P.S. 15 students out of class to perform as
many hours of ABA instruction as each student requires. (Id. at
306:24-307:24, 313:7-314:11.) She testified that Motta and
Cebrian administer ABA to children "within 10 to 30 [minutes
each day] depending upon the child's need." (Id. at 382:18-
383:7.) Similarly, Washburn testified that she administers

about 30 minutes of 1:1 discrete-trial ABA to students of hers
who require it.  (Id. at 813:10-20.)  Yet Nicklas and Dr.
Salsberg both testified that discrete-trial ABA is not effective
unless it is used for many hours each week.  (See id. at 401:1-
402:5 (describing supporting research), 579:17-19 ("30, 40 hours
a week are sort of an industry minimum and really clinically
what is needed for [children P.H.'s age].").)  Notably, Washburn
agreed that she had heard 20-30 hours per week of 1:1 discrete-
trial ABA was necessary for the student to receive an
educational benefit (id. at 814:3-11), but she also testified
that one nonverbal student had learned twenty new words under
her own regimen (id. at 827:10-16).

     Further, Nicklas gave undisputed testimony that one needs
"very intensive training" in order to utilize an ABA program.
(Id. at 403:23-404:3.)  Nicklas herself studied in an American
Psychological Association-accredited program for seven years,
"[a]nd even past that, [she] was still learning new things[]
because it's a complex[,] continu[ally] changing field[;] you
really need to . . . follow the research to see what's most
effective and what best practices are."  (Id. at 404:3-11.)
Motta, however, has no training in ABA other than in-school
instruction by Cebrian.  (Id. at 313:7-19 ("Currently, she is
being trained in school . . . ."), 314:12-22.)  Washburn's only
formal training in discrete-trial ABA consisted of a thirty-

34

hour, video-based class, as well as some amount of on-the-job
experience.   (Id. at 803:19-805:11.)

Second, Cruz testified that P.H. "would have been a good
fit for [Motta's] class academically and socially . . .
[b]ecause some of the kids . . . presented . . . the same type
of stuff [sic] that [P.H.] right now is showing . . . in his
IEP."   (Id. at 282:14-21.)   Specifically, "the reading readiness
level, the math levels, [and] the functioning level [were]
similar."   (Id. at 283:6-8.)   Yet Cruz's example of achieving
positive results with a similar child involved using a picture-
based system to develop the child's expressive language skills.
(Id. at 284:4-5.)   Not only does this example lack sufficient
detail to make a meaningful comparison to P.H., but this is also
the same system the school uses only for non-verbal students.
(See id. at 265:17-24, 266:8-9 ("It's who could verbalize do not
use the Picture Exchange System.").)   P.H. is not non-verbal
(see District Ex. 2 at 2); thus, there is no reason to believe
that Cruz's comparison is valid and no reason to expect that
P.H. would have experienced positive results from the same
treatment.

With respect to opportunities to interact with P.H.'s
peers, Cruz testified that P.S. 15 facilitates "mainstreaming"
by having its principal encourage disabled and non-disabled
students to meet one another in the hallways, primarily at the

35

beginning and the end of the day.  (See id. at 340:22-343:1.)

Cruz did not identify any other mainstreaming opportunities P.S.

15 would have offered P.H.  (See id.)  She also stated that the

school was not academically mainstreaming any of the students in

September, and as of April 2, 2008 had only been mainstreaming

one new student.  (Id. at 337:2-13, 339:5-11.)  In any event,

the parties agree that shortly after M.H. visited P.S. 15,

Plaintiffs paid the remaining balance of P.H.'s BAC tuition

(Parent Ex. E)[15] and, on October 30, requested an impartial

hearing from the DOE pursuant to the IDEA (Parent Ex. A).

### D.   P.H.'s Program at the Brooklyn Autism Center

The BAC is a private school that accepts only children

diagnosed with autism.  (Hr'g Tr. 410:4-6, 414:4-6.)  The school

uses an intensive ABA program with a 1:1 student-teacher ratio.

(Id. at 405:17-406:13, 410:4-8.)  The BAC does not admit a child

unless its staff members determine, after meeting with the

family and observing the prospective student, that he or she

requires an intensive ABA program.  (See id. at 413:23-414:25

("[A] strict ABA program is not appropriate for every single

child. . . . It's not going to do them any justice to be in a

---

[15] "Parent Ex." refers to the documentary evidence submitted to
the Impartial Hearing Officer by Plaintiffs (titled "Parent
Exhibits") and jointly submitted under seal in this action on
January 28, 2010 [see dkt. no. 15].

36

more restrictive environment . . . if they can communicate and
. . . learn in a large group setting.").)

The BAC has five teachers and five students, including P.H.
(Id. at 410:19-24.)  Physically, the school consists of one
classroom and one playroom located in (and rented from) the
International School of Brooklyn, a private general-education
school.  (Id. at 410:12-15.)  Each BAC student has a cubicle
with a desk, chairs for the student and teacher, and all the
necessary program materials.  (Id. at 411:13-19.)  The student
is responsible for keeping track of his or her own daily
schedule and putting the class materials away at the end of each
day.  (Id. at 411:20-412:6.)  All of this is meant to "promote
as much independence as possible."  (Id. at 412:5-6.)  The
students also spend time learning in dyads as they prepare to
learn in small-group settings.  (Id. at 442:4-443:8.)  With
respect to mainstreaming opportunities, the BAC students have an
African drumming class and an art class with typically
developing students.  (Id. at 412:19-413:6.)  They also share
the hallways and have recess and some social activities
together.  (Id. at 445:18-446:15.)  Nicklas testified, however,
that none of the BAC students is prepared for mainstream
academic classes.  (Id. at 413:19-22.)  During his first year at
the BAC, P.H. made friends with a typically developing boy at
the Brooklyn International Academy.  (See id. at 695:15-20.)

37

With respect to academics, the teachers use discrete-trial ABA and keep extensive data on each student's progress.  (See Parent Ex. F.)  They review that data to determine whether their current programs are working or need to be modified.  (See, e.g., Hr'g Tr. 425:21–426:4 ("[W]e have to constantly see if we're not making progress we need to make some changes [sic].").)  The teachers also rotate every 30 minutes to ensure that students' skills are consistent in their interactions with different people; this process is called "generalization."  (Id. at 423:4–8.)

The BAC evaluated and admitted P.H. in accordance with its standard admission procedure.  (See id. at 415:8–418:4.)  Nicklas observed P.H. at his home.  (Id. at 416:2–3.)  P.H.

> displayed a lot of maladaptive behaviors, a lot of screaming[ and] hand biting. . . .  [S]omeone was trying to do an activity with him and he swiped all the materials onto the floor.  He couldn't sit appropriately at his desk, at his table.  He had to keep being redirected.  He had little to no eye contact.  He had some spontaneous speech, but it was limited to labeling things or stating things that weren't really relevant to the present environment.

(Id. at 416:3–13.)  Nicklas "observed in the data . . . that his behaviors were as [sic] a lack of being able to communicate effectively.  And his way of communicating was screaming and biting his hand because he didn't understand that [he could just ask for help in order to get someone's attention]."  (Id. at 417:3–6.)  Based on these observations, Nicklas "fe[lt] strongly

that [P.H.] needed to have a strict ABA program in order to
. . . teach him to look at somebody when you're talking to them
and to . . . shape his behaviors." (Id. at 416:22-417:1.)

P.H. initially maintained these behaviors upon his
enrollment at the BAC. (Id. at 418:8-419:6.) Thus, Nicklas
"developed a program based on the most significant behaviors
that we needed to address . . . because . . . we have to get the
behaviors under control first." (Id. at 420:7-11.) Nicklas
testified that P.H.

> couldn't take a couple steps without . . . walking in
> this very awkward motion and engaging in all of those
> vocalizations. . . . So, our main focus of the program
> at the beginning was getting attending behaviors in
> place so that he could learn. . . . If he can't make
> eye contact, if he's not looking at you . . . how do
> we know he's even hearing us?   And if he's non-
> responsive—we have to get all this stuff under
> control because all these behaviors interfere with his
> learning.

(Id. at 420:12-421:2.) Further, P.H. had no protein in his diet
when he entered the BAC; he had not grown for one full year.
(Id. at 421:25-422:8.)

By the time Nicklas and M.H. testified at the hearing, P.H.
had made significant progress. For example, through a program
called "eating novel foods," the BAC had introduced protein and
other foods into his diet: P.H. had begun eating fish sticks,
chicken, peanut-butter-and-jelly sandwiches, vegetables, and
cereal. (Id. at 424:12-425:16.) Nicklas went to P.H.'s home to

ensure that his food desensitization program became generalized
to environments outside of school.  (Id. at 426:15-19.)  P.H.
also learned to walk quietly and appropriately without making
"non-contextual vocalizations."  (Id. at 430:11-431:10.)  With
respect to social mainstreaming, Nicklas testified that although
the BAC students benefit from it only "[t]o a very low level"
(id. at 446:19-447:3), P.H., who came in not "really know[ing]
how to play," had progressed to engaging in parallel play (id.
at 447:4-6).

M.H. testified that

> [t]here is more spontaneous language.  He stays on
> task longer.  I mean I [previously] couldn't get him
> to . . . sit for ten minutes[, but t]wo weeks ago I
> actually brought him to his first Broadway show.  And
> he sat for two and a half hours . . . . Last night, he
> knows [sic] his bedtime's 8:00.  He literally looked
> at the digital clock . . . and he said time is it
> [sic]?  I said you know what time it is [P.H.]  He
> look[ed] at the clock and said it's 8—0—0, time to go
> to bed.  He went right into his bedroom.  That is
> . . . a first. . . .  [E]very day there are milestones.

(Id. at 678:5-679:4.)  Dr. Salsberg, who observed P.H. at the
BAC, testified that P.H. was "[a]bsolutely" receptive to his
instruction there.  (Id. at 585:6-8.)  He stated:

> [P.H.] was engaged, reciprocal, you know.  He would
> still pull his, you know, trying to go off task, but
> they were right on him and they were usually a step
> ahead of him.  So he was atte[n]tive and stayed
> through every single lesson we observed in the dyad
> and in the one-to-one with an ABA person, or sometimes
> two ABA people . . . .

(Id. at 585:8-15.)  He concluded that the BAC is "[a]bsolutely

conferring an educational benefit on P.H.  (Id. at 585:17-21.)

As the IHO found,

> the student has made significant progress as reflected
> in the data maintained  .  .  .  .  He has learned to
> identify objects he wants, to ask for help, to walk
> appropriately and quietly.   The  student  is  more
> engaged[;] he is able to identify basic numbers and
> words, count by rote to ten[, and] respond to social
> questions.   He can state his birthday, the names of
> family members and his address.

(IHO Decision 9-10.)  In short, P.H.'s program at the BAC proved

to be significantly beneficial for him.

Dr. Salsberg also testified that P.H.'s 1:1 program at the

BAC is not overly restrictive.  He stated:

> Unfortunately I don't think that there is a less
> restrictive  environment  [in  which]  we  could  make
> appropriate progress.  Again, the literature is pretty
> clear and clinically knowing [P.H.], it's pretty clear
> that he needs the one-to-one  .  .  .  to make progress.
> .  .  .  [I]f there were typically developing peers there
> during the day, they would be distracting to him.  He
> would not be using those models in the appropriate
> way.
>
> It's nice that his school has the opportunity to
> expose him to typically developing models, but it's
> certainly not a necessary factor that's going to
> promote his improvement right now.  Right now he needs
> more importantly the one-to-one to make appropriate
> progress.

(Id. at 586:2-18.)  He concluded that P.H. was not ready for a

less restrictive educational environment.  (Id. at 587:21-

588:1.)  White's testimony on cross-examination was consistent

with Dr. Salsberg's assessment.  She stated:

41

[P.H.] does tend to get distracted when——especially if there are, you know, other children or other people around. So there are certain——I guess what I'm saying is he functions really well on a one-to-one basis. But even on a one-to-one basis, sometimes he has trouble when he's given prompts. He needs——his focus really needs to be directed on the verbal information. It's hard for him.

        So I think a special education teacher definitely would be able to provide that level of prompt, but it might be difficult in a group setting, depending on . . . what kind[s] of skills they're working on.

(Id. at 632:23-633:11.)

        P.H.'s program, however, was not without its flaws. The BAC does not provide related services——such as speech therapy, physical therapy, and occupational therapy——on site because it is "a strict ABA school." (Id. at 447:12-18.) M.H. testified that he and E.K. pay for P.H. to receive the following services at home each week: one hour of physical therapy, two forty-five-minute sessions of occupational therapy, and three thirty-minute sessions of speech therapy. (Id. at 675:13-676:2.) The parents meet once every one or two months with Nicklas and the related service providers to discuss P.H.'s progress. (Id. at 447:20-448:5, 676:3-24.) This regimen, however, does not implement the recommendations given to the CSE team that created P.H.'s IEP. (See District Exs. 1-14 (setting forth the relevant information that was before the CSE team).) M.H. testified that although he did not feel it was appropriate to meet all of P.H.'s needs (id. at 676:25-677:3), Plaintiffs could not afford to pay for any

42

more related services for P.H. (id. at 677:4-14).  Yet M.H. also

stated, with respect to P.H.'s related services, that "he's

making less progress [than previously] but steady progress."

(Id. at 706:10-20.)

### E.    The New York State Administrative Hearings

On October 30, 2007, Plaintiffs requested a due process

hearing, alleging that the DOE denied P.H. a FAPE and seeking

reimbursement for P.H.'s BAC tuition.  (Pls' 56.1 Stmt. ¶ 51;

DOE's 56.1 Resp. ¶ 51.)  Over the course of eight days between

January 30, 2008 and September 5, 2008, the IHO heard testimony

and accepted evidence from both parties.  (Pls' 56.1 Stmt. ¶ 52;

DOE's 56.1 Resp. ¶ 52.)  On October 2, 2008, the IHO rendered a

decision finding (1) that the DOE failed to offer P.H. a FAPE;

(2) that the parents' placement of P.H. at the BAC was

appropriate; and (3) that the parents were equitably entitled to

reimbursement of P.H.'s $80,000 BAC tuition.  (See Findings of

Fact and Decision, Case No. 113216, at 15-17 (Oct. 2, 2008).)

On November 10, 2008, the DOE appealed the IHO's decision

to the State Review Officer ("SRO").  Upon review, the SRO

reversed the IHO's decision, finding that the DOE had in fact

offered P.H. a FAPE.  (See Decision, No. 08-131, at 14-15 (Dec.

10, 2008) [hereinafter "SRO Decision"].)  The Parents then filed

suit in this Court on April 9, 2009 seeking review of the SRO's decision. [See dkt. no. 1.]

### III. SUBJECT MATTER JURISDICTION

This Court has jurisdiction over claims arising under the IDEA pursuant to 20 U.S.C. § 1415(i)(3)(A).

### IV. DISCUSSION

#### A.    Legal Standard for Summary Judgment

In an IDEA case, summary judgment "often triggers more than an inquiry into possible disputed issues of fact. Rather, the motion serves as a 'pragmatic procedural mechanism' for reviewing" an administrative determination. Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks omitted) (citing, inter alia, Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 892 (9th Cir. 1995) ("Though the parties [in an IDEA action] may call the procedure 'a motion for summary judgment' . . . , the procedure is in substance an appeal from an administrative determination, not a summary judgment.")); see also T.Y., K.Y. ex rel. T.Y. v. N.Y. City Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009) ("The court's inquiry is a results-based standard in many respects, concerned more with a just outcome for a disabled student than with judicial efficiency."). As such, the district

44

court's role is "circumscribed." T.P. & S.P., 554 F.3d at 252.

"While the district court must base its decision on the

preponderance of the evidence, it 'must give due weight to [the

administrative] proceedings, mindful that the judiciary

generally lack[s] the specialized knowledge and experience

necessary to resolve difficult questions of educational

policy.'" Id. (quoting Gagliardo, 489 F.3d at 113) (citation

and internal quotation marks omitted). Accordingly, "district

courts may not 'substitute their own notions of sound

educational policy for those of the school authorities which

they review.'" A.C. & M.C. ex rel. M.C. v. Bd. of Educ., 553

F.3d 165, 171 (2d Cir. 2009) (quoting Rowley, 458 U.S. at 206).


   B.   Application to Plaintiffs' Tuition Reimbursement Claim

   Claims for tuition reimbursement are subject to a three-

step analysis. Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186,

192 (2d Cir. 2005).

   First, [the court] examine[s] whether the state has
   complied with the procedures set forth in the IDEA.
   Second, [the court] consider[s] whether the IEP
   developed through the Act's procedures is reasonably
   calculated to enable the child to receive educational
   benefits.   If these requirements are met, the State
   has complied with the obligations imposed by Congress
   and the courts can require no more.   If, however, the
   IEP is procedurally or substantively deficient, [the
   court] proceed[s] to the third step and ask[s] whether
   the private schooling obtained by the parents is
   appropriate to the child's needs.

45

Id. (citations, alterations, and internal quotation marks
omitted). In addition, "[e]quitable considerations are relevant
in fashioning relief, and the court enjoys broad discretion in
so doing. Courts fashioning discretionary equitable relief
under [the] IDEA must consider all relevant factors, including
the appropriate and reasonable level of reimbursement that
should be required." Florence County Sch. Dist. Four v. Carter
ex rel. Carter, 510 U.S. 7, 12 (1993) ("Carter").

## 1. Consideration of Methodology Evidence

As an initial matter, the parties dispute whether the IHO
properly took into consideration the methodology used to educate
P.H. Plaintiffs did not raise the issue of methodology in their
impartial hearing request (see Parent Ex. A); nevertheless, they
contend that the IHO properly considered the issue because the
DOE raised the issue in its direct examination of Jordan and
then had an opportunity to rebut Plaintiffs' own methodology
evidence. The DOE, on the other hand, urges the Court to accept
the SRO's determination that because Plaintiffs did not raise
the issue of methodology in their impartial hearing request, the
IHO exceeded her jurisdiction by considering it. For the
following reasons, the IHO's consideration of methodology
evidence was proper.

46

Title 20 U.S.C. § 1415(f)(3)(B) provides that "[t]he party

requesting the due process hearing shall not be allowed to raise

issues at the due process hearing that were not raised in the

[impartial hearing request], unless the other party agrees

otherwise."  Further, relying on precedent from the State Review

Office of the New York State Department of Education as well as

the Seventh Circuit Court of Appeals, the SRO stated that "the

impartial hearing officer [must] disclose his or her intention

to reach an issue which the parties have not raised as a matter

of basic fairness and due process of law."  (SRO Decision 11.)

Yet these legal standards are inapplicable to the IHO's decision

because the DOE, not Plaintiffs, raised the issue of

methodology.

        The first mention of methodology at the impartial hearing

occurred when the DOE's counsel stated in her opening argument:

    As previously we stated—as previously stated[,] the
    school personnel at P 94 are well trained in various
    teaching methods specialized for Autistic children
    including the TEACCH method, the DIR model and ABA.
    Best practices follow that a student's program should
    be developed using a myriad of techniques and not just
    ABA[,] which is the only thing that [P.H.] is getting
    at the Brooklyn Autism Center.

(Hr'g Tr. 13:18-14:1.)  Counsel then discussed methodology a

second time in her opening argument:

    Also the [BAC] program is overly restrictive in that
    it only offers one type of intervention, support
    intervention which is Applied Behavior Analysis.
    Again best practices show that a child's program

47

should be individualized to meet their needs and should, and when possible, contain various teaching methodologies that should be used and not just one which is what [P.H.] is getting at the Brooklyn Autism Center.

(Hr'g Tr. 15:5-13.)  Therefore, the DOE raised the issue of methodology, not Plaintiffs.

The DOE presented testimony on methodology beginning with its first witness.  On direct examination, Giselle Jordan defended the appropriateness of the DOE's proposed program by invoking methodology numerous times.  First, DOE counsel asked: "[w]hy did the CSE team decide that a 6:1:1 program recommendation was appropriate for [P.H.]?"  (Hr'g Tr. 63:17-19.)  Jordan responded:

> Well, it's the most intensive structured program . . . with highly skilled professionals who are licensed in Special Education and with Special Education methodologies to address the deficiencies of autistic children[.  T]heir techniques . . . are exactly what [P.H.] needed, which was the high level of prompting, [cue]ing, [and] modeling by the teacher . . . .

(Id. at 63:20-64:10.)  Later, with respect to whether the proposed placement could correct some of P.H.'s behavioral problems, Jordan testified:

> He's diagnosed with autism.  Autism [sic] children are not interested in relating.  So a Special Education teacher is given specific training in how to deal with trying to engage and help the students generalize those skills in socialization and across various settings. . . . They have special methodologies. They're trained specifically for that.

48

(Id. at 81:25-82:11.)   When commenting on the appropriateness of the program at the proposed school, Jordan stated: "[T]he city-wide program had very, very good programs for . . . children on the autistic spectrum.   And at that time, I believe the parent was not a big proponent of ABA.   And so I . . . expressed to them . . . how the program was operating."   (Id. at 84:12-18.)   Based on these and other premises, Jordan concluded, "I think [the DOE's proposed placement] was an appropriate program for [P.H.].   I think it would have met his needs."   (Id. at 86:1-3.)

Then the DOE went further.   During a later segment of direct examination, counsel questioned Jordan about whether the BAC's program was appropriate for P.H.   Jordan criticized at least one of P.H.'s discrete-trial activities as being "a very solitary kind of activity" (id. at 101:12-15), opining that the lack of group activities in his BAC program prevented P.H. from practicing "his daily communication skills" (id. at 102:3-20). She then amplified this opinion, stating that "perhaps doing more small peer pragmatic language skills and socialization and play skills would be more appropriate in meeting his deficits" than P.H.'s 1:1 discrete-trial lessons at the BAC.   (Id. at 103:8-11.)   She concluded that the BAC's program was not addressing P.H.'s needs.   (Id. at 108:11-15.)

In all of this testimony, the DOE elicited Jordan's express or implied opinion that the DOE's use of particular methodologies contributed to its program being appropriate for P.H. and that the 1:1 discrete-trial methodology employed by the BAC was inappropriate for P.H. The DOE had planned to elicit this testimony because counsel expressly raised the same issues in her opening statement. Thus, regardless of whether they raised the issue of methodology in their impartial hearing request, Plaintiffs cannot fairly be barred from rebutting this testimony with evidence of the appropriateness of those methodologies, and the DOE cannot genuinely claim that it was prejudiced by the IHO's consideration of such evidence. On this basis, Plaintiffs properly elicited, and the IHO properly considered, methodology evidence.

Indeed, the SRO himself, while barring Plaintiffs' use of methodology testimony, expressly considered certain methodology testimony offered by the DOE. Relying in part on Jordan's testimony "that the classroom employed the use of various methodologies including TEACCH, ABA, Floor Time[,] and Direct Relationship Interaction," the SRO determined "that the recommended placement was reasonably calculated to enable the student to obtain educational benefit." (SRO Decision 14.)

In addition, DOE counsel voiced no objection to methodology discussions during cross examination. For example, counsel did

not object when Jordan began volunteering testimony on

methodologies.  During a line of questioning about the

appropriateness of the DOE's proposed placement, Plaintiffs'

counsel asked Jordan how the DOE would have determined whether

P.H. was meeting his annual goals.  She replied: "Well, in the

city-wide program, they do ongoing monitoring and progress

[using a standardized assessment], . . . and they have TEACCH

method [sic], because they use best practices."  (Id. at 146:1-

10.)  When Plaintiffs' counsel asked what she meant by "best

practices," Jordan responded, in relevant part:

> The [c]ity[-]wide program implements best practices,
> which means that they use the methodology that best
> matches the youngster.  So if a youngster is low
> functioning—I don't know if you want me to give you
> an example, but some of the best practices are aspects
> of ABA, DIR, TEACCH, Floortime.  Those are all
> methodologies used depending on the child, his
> individualized needs.  And they match up the
> methodology with the child.

(Id. at 146:11-147:7.)  She added that the approach is "[k]ind

of eclectical [sic], depending on the needs of the youngster."

(Id. at 148:2-6.)

Nor did the DOE's counsel object to any of the following

questions or Jordan's responses thereto:

> "Isn't it true that the SEIT services that the student
> was receiving were provided using an ABA methodology?"
> (Id. at 167:3-12.)

> "Have you had any training in Applied Behavior
> Analysis?"  (Id. at 174:1-175:10.)

"How about TEACCH?  Have you ever received any instruction in TEACCH methodology?"  (Id. at 175:11-21.)

"Do you know what programs refer to when dealing with an ABA or an applied behavior analysis educational methodology?"  (Id. at 177:2-15.)

"What is discrete trial instruction?"  (Id. at 177:16-178-14.)

"[D]o you know what the ultimate goal of an ABA or a discrete trial methodology is?"  (Id. at 178:15-179:3.)

Instead, the DOE's counsel devoted almost all of her re-direct examination to issues involving methodology.  (See id. at 180:15-185:18.)  She first asked Jordan about her "understanding of what types of methodologies are used for students."  (Id. at 180:19-21.)  Then she asked, "how is it determined as to what would be the best methodology for the student to use in the D75 classroom . . . ."  (Id. at 182:13-19.)  Jordan answered that the determination "would be up to someone who's an expert, which is the curriculum coach who comes in and works individually with the teachers.  And she's like a consultant."  (Id. at 182:20-24.)  Counsel then asked about Jordan's understanding of whether P.H. had been receiving ABA instruction.  (See id. at 183:21-184:9.)

Only during re-cross examination did DOE counsel first object to a discussion of methodology.  (See id. at 186:14.)  And even then, counsel limited her objection to more abstract methodology issues; she expressly did not object to the more

specific discussions of how certain methodologies applied to

P.H.  The following colloquy demonstrates counsel's distinction:

> [DOE COUNSEL]: Objection as to relevance, and I would say——I would even submit that it's outside the scope of re-direct.  You're asking about methodologies, which I did not cover on my re-direct.
>
> [PLAINTIFFS'
> COUNSEL]: She opened the door to methodology upon re-direct, and she said it's a very individualized program where TEACCH is utilized. . . .
>
> [DOE COUNSEL]: . . . Yeah.  But that's specific to the program in the D75 six to one to one.  I did not ask about overall methodologies, which is what counsel is asking about.  It's clearly outside the scope of the . . . re-direct.

(Id. at 188:2-18.)  Thus, at best counsel sought to exclude only

testimony relating to some, not all, methodology issues.

This colloquy illuminates three points.  First, even if the

DOE had not introduced the topic of methodology, it had no

objection to that topic until re-cross examination, when

Plaintiffs were trying to rebut testimony the DOE had already

offered.  "To be timely, an objection or motion to strike must

be 'made as soon as the ground of it is known, or reasonably

should have been known to the objector.'"  Hutchinson v.

Groskin, 927 F.2d 722, 725 (2d Cir. 1991) (quoting United States

v. Check, 582 F.2d 668, 676 (2d Cir. 1978)).  By failing to

object until well after both parties had introduced significant

evidence on the issue of methodology, the DOE thereby waived any objection to testimony about methodology.

Second, the distinction proffered by DOE counsel does not show why evidence of "overall methodologies" should be excluded. Once the DOE had introduced testimony that its proposed use of the TEACCH and ABA methodologies contributed to a substantively appropriate education for P.H.——and that the 1:1 discrete-trial program at the BAC was inappropriate——Plaintiffs were entitled to rebut that showing with testimony that TEACCH and other methodologies are never appropriate for educating autistic students and that 1:1 discrete trials are appropriate for P.H. This necessarily implicates testimony regarding "overall methodologies." Indeed, excluding such evidence would unfairly deprive Plaintiffs of the ability to rebut the DOE's showing.

Third, DOE counsel implicitly accepted that at least some methodology testimony——i.e., methodology as it applied to P.H.—— was properly under the consideration of the IHO. She stated that the methodology testimony she elicited from Jordan was "specific to the program in the D75 six to one to one." (Id. at 188:13-18.) This statement belies her objection to all methodology issues made for the first time three-and-a-half months later and after both sides had presented their entire cases-in-chief: "Every issue that I address[ed] on my Prong I case had to do with the Hearing Request, and now that [sic]

54

there's expert testimony that was presented by the A[B]A
specialist from [the] BAC school [on] why the [methodology
employed by teachers at the DOE's proposed placement] is
inappropriate." (Id. at 731:3-10; see id. at 729:4-12
(identifying the relevant issue as "why a 6-1-1 program is not
appropriate").) In short, the DOE only raised its complaint
that all methodology testimony was outside the scope of the
impartial hearing request after Plaintiffs had introduced at
least three witnesses who were damaging to the DOE's case: Jaime
Nicklas, Dr. Salsberg, and M.H.

     Finally the IHO's consideration of methodology did not come
as a surprise to the DOE, whose counsel introduced the issue in
her opening statement and objected to the issue only after she
had cross-examined three of Plaintiffs' four witnesses on the
subject, and Plaintiffs had rested. Plaintiffs' witnesses were
called only after Jordan testified that certain methodologies
helped make the DOE's program appropriate and the BAC's program
inappropriate. Even assuming arguendo that Plaintiffs'
testimony about methodology actually did surprise and unfairly
prejudice the DOE at the time Plaintiffs introduced it, the IHO
cured the problem by allowing the DOE to present two rebuttal
witnesses, both of whom discussed methodology issues at length
on direct examination. (See id. at 767:9-770:11, 773:22-776:1,
777:9-780:16, 848:5-870:2.) Accordingly, the SRO improperly

55

reversed the IHO's consideration of methodology evidence, and this Court considers such evidence in its disposition of the parties' motions.

### 2.    Procedural Compliance

The IDEA provides:

> In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies (I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits.

20 U.S.C. § 1415(f)(3)(E)(ii). "Only procedural inadequacies that cause substantive harm to the child or his parents—meaning that they individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP— constitute a denial of a FAPE." Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 (S.D.N.Y. 2007), aff'd, No. 07-0479-cv, 2008 WL 3852180 (2d Cir. Aug. 19, 2008).    The parents assert that the DOE committed three separate procedural violations that resulted in the denial of a FAPE to P.H.: (1) determining P.H.'s goals on an arbitrary basis such that they failed to reflect the results of his evaluations; (2) failing to

conduct an FBA despite awareness of P.H.'s injurious behaviors; (3) failing to mandate the related service of counseling despite setting forth a counseling requirement in the IEP.  For the following reasons, the Court agrees that the DOE failed to provide P.H. a FAPE.

### a.    Improper Determination of Goals

"The sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 382 (2d Cir. 2003).  "Judicial deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful."  M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir. 2000) (internal quotation marks omitted). Yet a district court's "initial procedural inquiry is no mere formality," Walczak, 142 F.3d at 129, and "[c]ompliance with the procedures set forth in the IDEA is critical to ensure that the educational needs of a disabled child are met," M.C. ex rel. B.C. v. Rye Neck Union Free Sch. Dist., No. 06 Civ. 3898, 2008 WL 4449338, at *11 (S.D.N.Y. Sept. 29, 2008) (citing Rowley, 458 U.S. at 206).  This standard requires that the Court not impose its own view of whether the IEP's goals are appropriate for P.H.; however, it does not excuse the SRO from reaching

57

carefully reasoned conclusions.  The IHO asserted three grounds
for her finding that the goals in P.H.'s IEP were improperly
determined, all of which are discussed below.

### 1.   Generic Academic Goals
### and Objectives

First, Plaintiffs assert that the DOE determined the
academic goals and objectives that would be set forth in P.H.'s
IEP on the basis of P.H.'s grade level rather than the
evaluations Plaintiffs provided to the CSE, resulting in generic
goals that did not reflect consideration of P.H.'s unique
characteristics.  Specifically, Plaintiffs argue that Jordan's
incorrect belief that P.H. would be entering first grade,
followed by her subsequent failure to adjust the goals in P.H.'s
IEP upon learning of her mistake, demonstrates that the DOE
determined P.H.'s goals without considering P.H.'s evaluations
or the parents' concerns.  The DOE responds that the Court
should defer to the SRO's findings that the incorrect grade
level was a clerical error and that the IEP's stated academic
goals were consistent with P.H.'s abilities.

The IHO stated that Plaintiffs' position

is supported by Ms. Jordan's testimony, wherein she
stated that it was her understanding that the student
would be going into first grade[,] and accordingly the
goals and objectives were written to master first
grade performance standards.    However, at the IEP
meeting[,] she was informed that he would be going

into kindergarten, [so] she changed the grade from first grade to kindergarten, [but] the goals and objectives remained the same. This supports the parents' claim that the goals are generic and are apparently based on grade and not the specific special education needs of the student. It should be noted that . . . the annual goal for reading comprehension and math indicates the student must meet first grade standards.

(IHO Decision 15 (emphasis added).)   Reversing the IHO's

determination, the SRO found that the IEP

indicated that [P.H.] would meet kindergarten performance standards for reading comprehension, phonics and word[-]recognition skills[,] and math skills.   The hearing record further reveals that the academic present levels of performance on the IEP indicated that [P.H.]'s score of a percentile rank of 25 on the Bracken [assessment] was within the average range and indicated that [P.H.] had acquired age level pre-academic skills.   Consequently, the goals as written are consistent with the indicated academic present levels of performance of the student. Therefore, . . . the hearing record supports that annual academic goals at the kindergarten level were appropriate for [P.H.] and that they provided meaningful guidance to the teacher responsible for implementing the goals.

(SRO Decision 12-13 (emphasis added, citations and internal

quotation marks omitted).)   The SRO justified his conclusion by

comparing P.H.'s pre-academic-skills score on his Bracken

assessment (see District Ex. 15 at 4) with the handwritten grade

levels provided for the annual academic goals on P.H.'s IEP (see

id. at 19).

Deferring to the state administrators on matters of

educational policy, the Court is in no position to disagree as

to the appropriate weight to be accorded P.H.'s Bracken score. See Grim, 346 F.3d at 382. Nevertheless, the SRO's determination cannot be considered "thorough and careful" because the SRO considered only P.H.'s annual academic goals, whereas the IHO based her decision on both the annual academic goals and the short-term objectives—with an emphasis on the short-term objectives. First, the IEP itself consistently distinguishes "annual goals" from "short-term objectives" (see District Ex. at 11-23), and the IHO took issue with both the "goals and [the] objectives." (IHO Decision 15.) Second, the upshot of the IHO's determination is that the short-term objectives were generic because they were not modified to reflect the change in the grade level on P.H.'s annual goals. By reversing only on the basis that the annual goals were not generic, the SRO failed to consider the IHO's more important finding that the short-term objectives were generic.

Third, a review of the IEP confirms that the substance of the short-term objectives was necessarily central to the IHO's decision. For example, P.H.'s annual goal in math states only that "[P.H.] will improve and develop mathematics skills to meet K[indergarten] performance standards." (District Ex. 15 at 19 (noting that the grade level was changed from "1st Grade" to "K[indergarten]").) The IHO found that although Jordan "changed the grade from first grade to kindergarten, the goals and

60

objectives remained the same." (IHO Decision 15.) Since the
annual goal sets forth nothing but a grade-level performance
standard, the "goals and objectives" to which the IHO referred
must have been the short-term objectives. Those objectives
contain more detailed requirements such as: "He will understand
opposites relevant to math, like before/after and few/many, with
80% accuracy." (District Ex. 15 at 19.) Those objectives were
the ones that "remained the same" (IHO Decision 15), and the IHO
found that Jordan's failure to reconsider them in light of the
change in P.H.'s grade level resulted in the IEP's failure to
reflect P.H.'s unique characteristics. (See id.) Thus, the
SRO's decision was not "reasoned and supported by the record"
because he reversed without considering whether the academic
short-term objectives were generic, Gagliardo, 489 F.3d at 114,
and so his decision is not entitled to deference.

     The IHO's decision, however, is entitled to deference
because it comports with the Gagliardo standard: the IHO
expressly considered all the evidence before her and stated a
basis for her findings that reflected a thorough analysis of
that evidence. Moreover, the Court finds no reason to disturb
her findings because they are consistent with the preponderance
of the evidence. She considered not only the fact that P.H.'s
standardized test scores were consistent with his age level (see
IHO Decision 5) but also Jordan's testimony regarding her

misunderstanding of P.H.'s grade level (see id. at 15) and her failure to reconsider P.H.'s academic short-term objectives (see id.).  These findings sufficiently justify her conclusion.  In addition, Jamie Nicklas's testimony, which the IHO also considered (see id. at 10), supports the IHO's conclusion.  Although she conceded that at least one academic annual goal was appropriate for P.H. (see Hr'g Tr. 457:22-458:6), Nicklas testified that many of the annual goals and short-term objectives were too advanced (see supra at 15-17).  This tends to suggest that those goals were in fact designed for a first-grade student instead of a kindergartener.  Accordingly, the IHO's decision is consistent with the preponderance of the evidence, and the Court finds that the IHO's determination was correct.

In its brief, the DOE—like the SRO—fails to address the IHO's reasons for her conclusion and instead relies exclusively on P.H.'s Bracken score.  This argument mimics the SRO's analysis and, therefore, suffers from all the same defects.  The DOE also argues that the Court should adopt the SRO's decision because Cruz testified that even if P.H.'s IEP contained improper goals, the teachers at his placement could modify those goals to make them appropriate.  (See Hr'g Tr. 350:4-352:16.)  Yet the DOE asserted this harmless-error argument before the IHO (see id. at 903:13-20), who expressly considered Cruz's

testimony on this point (see IHO Decision 6) and nevertheless found in favor of Plaintiffs.  Absent clearly erroneous reasoning, it is not this Court's place to reconsider the factual determinations of the IHO, who herself observed the witnesses' testimony, made credibility judgments, and applied her educational expertise in rendering her decision.

Accordingly, the Court adopts the IHO's finding that the annual academic goals and objectives stated on P.H.'s IEP are based on P.H.'s expected grade level and not on his actual needs and abilities.  (See id. at 15.)  The Court defers to the IHO's conclusion that this deficiency provided one basis on which P.H. was denied a FAPE.  (See id. at 16.)

### 2. Immeasurable Goals and Objectives

Second, Plaintiffs urge the Court to adopt the IHO's finding that some of P.H.'s goals and objectives were not measurable.  Applicable state and federal regulations provide the following:

(iii) Measurable annual goals.

- (a) The IEP shall list measurable annual goals, including academic and functional goals, consistent with the student's needs and abilities. . . .
- (b) Each annual goal shall include the evaluative criteria,

> evaluation procedures and schedules to be used to
> measure progress toward meeting the annual goal during
> the period beginning with placement and ending with the
> next scheduled review by the committee.

N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2); see 34 C.F.R.
§§ 300.320(a)(2)-(3) (setting forth substantially the same
requirements). The IHO found that "some of the . . . annual
goals and short[-]term objectives in reading comprehension,
reading skills and math are not measurable since they do not
contain evaluative criteria, evaluation procedures and schedules
to be used to measure progress." (Id.) Importantly, all of
these are academic goals and objectives. (See District Ex. 15
at 19-20.)

Reversing the IHO's decision on this issue, the SRO found
that the annual goals were immeasurable but that the short-term
objectives were measurable and thereby cured the annual goals'
deficiencies. (SRO Decision 13.) Notably, the SRO failed to
address the measurability of P.H.'s academic goals, which formed
the entire basis for the IHO's conclusion.[16] He expressly based
his conclusion on "[a] review of [P.H.]'s non-academic goals"

---

[16] The SRO's only discussion of P.H.'s academic goals addresses
whether those goals reflected P.H.'s unique characteristics and
abilities. (See SRO Decision 12-13.) It does not address
whether the goals are sufficiently measurable, which was a
distinct procedural issue in the IHO's decision. (See IHO
Decision 15-16.)

64

and "goals and short-term objectives relating to [P.H.]'s social/emotional needs." (Id. (emphases added).)  Accordingly, the SRO's conclusion with respect to the academic goals is entitled to deference only if his discussion is well reasoned and applies with equal force to those goals.

Under this analysis, two of the SRO's findings are entitled to deference.  The SRO found that the IEP set forth evaluative schedules for the non-academic goals because it "indicated that the student's progress would be reported four times during the year." (Id.)  The IEP provides this schedule for the academic goals as well as the non-academic goals. (See District Ex. 15 at 11–23 ("There will be 4 reports of progress per year.").) Therefore, the SRO's reasoning must apply with equal force to the academic goals, notwithstanding his failure expressly to consider them.  Accordingly, the Court defers to the SRO's analysis and finds that the academic goals contained evaluative schedules.

Likewise, the Court defers to the SRO's conclusion that the short-term objectives contain evaluative criteria.  The SRO identified evaluative criteria as being an indication of how frequently P.H. must complete an objective successfully before being considered to have "passed" that objective.  Many, though not all, objectives in the IEP provide that P.H. must complete the objective 80% of the time in order to pass.  Most

65

importantly, all of the academic goals indicate 80% as the
evaluative criteria.  Accordingly, the Court defers to the SRO's
finding that the short-term objectives contained evaluative
criteria.

The SRO's conclusion that the short-term objectives
contained evaluative procedures, however, is not entitled to
deference.  The SRO found that "the majority of the student's
[non-academic] short-term objectives were both detailed and
measurable."  (SRO Decision 13 (citation omitted).)  As an
example, the SRO cited a social-interaction short-term objective
stating that P.H. "will go along with interactions (e.g. games
or outdoor activity) initiated by some peers in some situations
independently 4/5 times, teacher observation."  (District Ex. 15
at 17; see SRO Decision 13.)  The SRO cited similarly written
short-term objectives relating to P.H.'s social and emotional
needs.  (See id.)  In all of these examples, either the phrase
"teacher observation" or the phrase "by imitating" indicates the
evaluative procedure for measuring P.H.'s progress.  (See SRO
Decision 13 (stating that "imitation of a skill and teacher
observation" are evaluation procedures).)  The vast majority of
objectives in the IEP, however, do not contain any such
measurement statement.  (See District Ex. 15 at 11-22.)  Indeed,
only 17 of the IEP's 85 short-term objectives contain an
evaluation procedure, and, most importantly, not one of the

academic short-term objectives mentions an evaluation procedure. (See id. at 19-20.)  Accordingly, the SRO's finding is not entitled to deference because his analysis, which the Court finds ill-reasoned in any event, does not apply to the academic short-term objectives.

The IHO's finding, however, was "reasoned and supported by the record" and is therefore entitled to deference.  Gagliardo, 489 F.3d at 114.  Although her relevant finding was brief, it was based on her express consideration of all the witnesses' testimony (see IHO Decision 4-14), and the IHO's use of the identical language contained in the regulations indicates that those regulations guided her review of the academic objectives. Accordingly, the Court defers to her finding that the academic short-term objectives fail to state evaluative procedures.

For the same reasons stated above, these results are also consistent with the preponderance of the evidence.  The academic short-term objectives properly contain both schedules and evaluative criteria.  Yet they are deficient in that they fail to set forth evaluative procedures as required by federal and state regulations.  See 34 C.F.R. § 300.320(a)(2)-(3); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2).  Neither the IHO's decision nor the SRO's decision indicates whether the administrative officers would have considered only this defect

harmless, but the Court need not reach that issue because it
concludes on other grounds that P.H. was denied a FAPE.

### 3.   Non-Academic Goals That Were Too Advanced

Third, state and federal regulations require that the IEP's
annual goals be "consistent with the student's needs and
abilities."  N.Y. Comp. Codes R. & Regs. tit. 8,
§ 200.4(d)(2)(iii); see 34 C.F.R. § 300.320(a)(2)(i).  The IHO
found that "the annual goal and objectives in communication and
socialization skills did not adequately reflect [P.H.]'s current
level of skills as provided in his evaluations and some [of the
objectives] were too advanced."  (Id.)  The IEP states the goal
and objectives as follows:

ANNUAL GOAL

[P.H.] will improve his commun[ic]ation and
social[i]zation skills to facilitate classroom
functioning.

SHORT-TERM OBJECTIVES

[P.H.] will increase attention span in classroom
situations.
[P.H.] will remain on the same topic when engaged with
a peer or an adult for a minimum of 4 exchanges with
adult prompting.
[P.H.] will consistently respond to simple commands.
[P.H.] will respond to two[-]step commands.
[P.H.] will answer simple "wh" questions with 80%
accuracy.
[P.H.] will provide verbal descriptions, functions and
definitions of objects.

[P.H.] will initiate greetings and respond to greetings.
[P.H.] will ask questions for clarification (with teacher prompts).

(District Ex. 15 at 21.) The IHO based her decision in part on the testimony of P.H.'s speech therapist, who stated "that [P.H.] has significant delays in language which impact every aspect of his life, including behavior, learning and being able to interact appropriately with others." (IHO Decision at 15-16.) The speech therapist also stated that, as of May 2008—one year after the CSE meeting—P.H. was "just starting to address conversation." (Id. at 16.) Notably, the DOE offered no testimony or other evidence to rebut the speech therapist's testimony.

In conclusory fashion, the SRO reversed the IHO's decision on this point. Although he did make specific findings with respect to the detail and measurability of the communication and socialization goals and objectives, the SRO's only statement with respect to whether those goals addressed P.H.'s unique needs was that they "comprehensively addressed the student's needs in th[o]se areas." (SRO Decision 13.) The SRO did not state the basis for his reversal or provide any analysis. "Because the SRO did not make any findings on this issue, the decision of the SRO is not entitled to deference with respect to whether" the socialization and communication goals and

objectives addressed P.H.'s unique needs and abilities.

Jennifer D. ex rel. Travis D. v. N.Y. City Dep't of Educ., 550 F. Supp. 2d 420, 432 (S.D.N.Y. 2008) (Koeltl, J.); see A.D. & M.D., 2010 WL 447371, at *14. The IHO did, however, make a specific finding (see IHO Decision 15-16) that was supported by the unrebutted testimony of the speech therapist as well as the testimony of Jaime Nicklas, which she credited (see id. at 10). Accordingly, the Court defers to the finding of the IHO that P.H. was denied a FAPE because his communication and socialization annual goal and short-term objectives were not tailored to his unique needs and abilities. As described above, this conclusion is consistent with the preponderance of the evidence.

### b. Failure to Conduct an FBA

"The IDEA requires that, in developing an IEP for 'a child whose behavior impedes the child's learning,' the school district must 'consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior.'" A.C., 553 F.3d at 172 (citing 20 U.S.C. § 1414(d)(3)(B)(i)). Failure to conduct an FBA does not amount to a procedural violation of the IDEA where the IEP sets forth other means to address the student's problematic behaviors. See id. at 172; M.N., 2010 WL 1244555, at *6.

70

Here, Plaintiffs contend that the CSE's failure to conduct an FBA renders the IEP procedurally deficient. According to Plaintiffs, the CSE's determination that P.H.'s behaviors did not interfere with his learning was based on Jordan's erroneous understanding of those behaviors. The IEP states that P.H. "does show some attention[-]seeking behaviors and will also become frustrated in particular circumstances by biting his hand and screaming" and that "[g]aps in his social and communication skills can be attributed to these behaviors emerging." (District Ex. 15 at 6.) Jordan, however, testified that "the behaviors that he was manifesting was [sic] actually very passive, non-responsive, you know, laughing or giggling, but they weren't interfering with his learning." (Hr'g Tr. 81:8-11.) Plaintiffs conclude that the CSE should have conducted an FBA to address these behaviors and that its failure to do so was caused by Jordan's misunderstanding.

Addressing this issue de novo,[17] the SRO noted that the IEP identifies P.H.'s aforementioned problematic behaviors but concludes that those behaviors "do[] not seriously interfere with instruction and can be addressed by the . . . special education classroom teacher." (District Ex. 15 at 7; SRO

---

[17] Although Plaintiffs specifically raised this issue in their impartial hearing request (see Parent Ex. A at 2), and the parties presented testimony on the issue, the IHO did not set forth any findings of fact or conclusions regarding an FBA.

Decision 7.)  Though the SRO did not expressly conclude that an
FBA was not required, that conclusion is implicit from his
findings.

The Court agrees with the SRO's analysis.  The IEP sets
forth the specific problematic behaviors in which P.H. engaged
and concludes that those behaviors did not rise to the level of
interfering with his learning.  (See District Ex. 15 at 7.)
Nevertheless, the IEP also sets forth a strategy for managing
those behaviors, stating that they "can be addressed by the
. . . special education classroom teacher."  (Id.)  Because it
provides for the management of P.H.'s behaviors, the IEP is not
procedurally deficient under the IDEA.  See A.C., 553 F.3d at
172.  Further, even if Jordan herself misunderstood what P.H.'s
problem behaviors were, those behaviors are unambiguously
identified in the IEP.  (See District Ex. 15 at 6.)  Although
Cruz testified that such behaviors typically call for an FBA
(Hr'g Tr. 310:5-15), she also stated that P.S. 15 would conduct
its own FBA if necessary (id. at 259:6-16).  Accordingly, the
CSE's failure to conduct an FBA does not constitute a procedural
violation of the IDEA.

## c.   Failure to Mandate Counseling

Plaintiffs contend that Jordan's failure to implement the
related service of counseling, where the IEP requires

counseling, renders the IEP procedurally deficient. In its statement of P.H.'s then-present social and emotional performance, the IEP states: "Counselor will address social and emotional concerns through counseling sessions." (See District Ex. 15 at 7.) But on its recommendation page, the IEP does not implement counseling. (See id. at 26.) Plaintiffs conclude that this omission constitutes a procedural violation of the IDEA.

Plaintiffs, however, failed to raise this issue in their impartial hearing request (see Parent Ex. A) and raised it for the first time on the cross examination of Giselle Jordan (see Hr'g Tr. 155:15-17). Unlike the issue of methodology, there is no indication that the DOE agreed to allow the IHO to consider the issue of counseling, and there is no indication that the DOE was on notice that counseling would be discussed. Indeed, the fact that DOE counsel at the impartial hearing did not discuss the issue on Jordan's direct examination suggests just the opposite. The IHO did not make any findings or draw any conclusions regarding counseling, and the SRO addressed the issue only in a footnote. (SRO Decision 13.) Because "[t]he party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the [impartial hearing request], unless the other party agrees otherwise," 20 U.S.C. § 1415(f)(3)(B), Plaintiffs improperly

raised the issue of counseling in the state administrative
proceedings.  Therefore, that issue is not properly before this
Court.

Even if the Court were to consider the merits of
Plaintiffs' claim, the deficiency would not rise to the level of
a procedural violation of the IDEA because P.H. would not have
been denied a FAPE as a result.  The IEP noted that a counselor
would address certain of P.H.'s behaviors, and the DOE
recommended that P.H. be placed in a school in which counseling
was available to all students.  (Hr'g Tr. 247:19, 278:2-7,
329:14-331:11.)  Specifically, Susan Cruz stated, "[c]ounselors
go into the classes with children with Autism regardless if
[sic] they have counseling on their mandates . . . ."   (Id. at
330:23-25.)  Plaintiffs offered no testimony to rebut the
availability of counseling.  Accordingly, the DOE's failure to
mandate counseling, were it properly before this Court, would
have been harmless.

### 3.    Substantive Compliance

"[A] school district complies with [the] IDEA's substantive
requirements if a student's IEP is 'reasonably calculated to
enable the child to receive educational benefit[s].'"   Cerra v.
Pawling Cent. Sch. Dist., 427 F.3d 186, 194 (2d Cir. 2005)
(quoting Rowley, 458 U.S. at 207).  It "fulfills its substantive

obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" Id. at 195 (quoting Walczak, 142 F.3d at 130 (internal quotations omitted)). "Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." Id. The District Court's role is to "examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan." Id. (internal quotation marks omitted); see also Grim v. Rhinebeck, 346 F.3d 377, 383 (2d Cir. 2003) ("[I]n violation of Rowley, the District Court impermissibly chose between the views of conflicting experts on a controversial issue of education policy—effective methods of educating dyslexic students—in direct contradiction of the opinions of state administrative officers who had heard the same evidence.").

Plaintiffs contest the DOE's substantive compliance with the IDEA on the grounds that neither the educational program set forth in the IEP nor the classroom in which P.H. was to have been placed reflected P.H.'s actual needs and abilities. The DOE, of course, urges that the Court defer to the decision of the SRO, who found that the DOE complied with the substantive

requirements of the IDEA.  For the reasons discussed below, the

Court agrees with Plaintiffs on both grounds.


        a.   Inappropriateness of the IEP

    The first basis for the IHO's "f[inding] that the DOE

failed to provide [P.H.] with a FAPE" was that the IEP's

recommended program was inappropriate.  (IHO Decision 16.)  The

IHO explained:

> The parents contend that the appropriate methodology
> for the student was ABA discre[te] trial instruction
> and the student's evaluations support their claim.
> Dr.  Salsberg provided a psychological addendum  in
> April, 2007, which recommended an intensive 1:1[] ABA
> program.   He testified that ABA is the most effective
> methodology used for children with autism and requires
> a minimum of 30-40 hours weekly of discre[te] trial
> instruction.   He stated that ABA[] discre[te] trial
> instruction  had  helped  in  reducing  some  of  the
> student's  maladaptive  behaviors  and  that  it  was
> imperative  to  continue  an  ABA  program  to  prevent
> regression  and  to  promote  learning  [and]  functional
> communication.   Ms. Washburn stated that two of her
> students receive discre[te] trial instruction on a 1:1
> basis, for thirty minutes per day.   She admitted that
> ABA research indicates that a minimum of 20-30 hours
> per week of discre[te] trial instruction is required
> in  order  for  a  student  to  receive  an  educational
> benefit.    The  proposed  program  utilized  different
> methodologies with an emphasis on TEACCH.   Based on
> the foregoing I find that the DOE failed to provide
> the student with a FAPE.

(Id. (citations omitted).)

    After concluding that the IHO lacked jurisdiction to

consider the issue of methodology, the SRO reversed the IHO's

decision.  (See SRO Decision 14.)  He stated:

Turning to a review of the program recommended in the IEP, I find that the offered 12-month programming in a 6:1+1 special class in a special school with related services of 30-minute individual [physical therapy] sessions twice per week, 30-minute individual [occupational therapy] sessions three times per week and 30-minute individual speech-language therapy sessions three times per week was appropriate to meet the needs of the student. Although the parents previously indicated that they believed that the student was doing "very well" in his mainstream preschool setting with SEIT support and they wanted him to be placed in a similar setting for kindergarten, the hearing record does not support that a general education setting would be appropriate to meet the student's needs.

(Id. (citing, inter alia, District Ex. 14).)

The SRO's decision on this point does not warrant deference because the SRO improperly excluded Plaintiffs' substantial methodology evidence, which tended to show that P.H. required a methodology employing a 1:1 student-teacher ratio. This evidence implied that the methodologies available within a 6:1:1 program were inappropriate for P.H. Notably, the SRO did not exclude the DOE's methodology evidence tending to show that the methodologies available within a 6:1:1 program were affirmatively appropriate for P.H. (See id.) Such a decision is not "well reasoned and supported by the record" and is therefore not entitled to deference. Gagliardo, 489 F.3d at 114.

The IHO, however, considered not only the same evidence that the SRO considered but also the substantial amount of

methodology evidence introduced by Plaintiffs. (See IHO
Decision 4-14, 16.) Having considered the parents' stated
wishes regarding the restrictiveness of P.H.'s classroom
environment (see id. at 4), P.H.'s need for 1:1 educational
support (see id. at 9, 11), and whether a 6:1:1 placement could
implement the methodology P.H.'s disability required (see id. at
10-12), the IHO concluded that the DOE's proposed placement
could not provide the 1:1 discrete-trial ABA that constituted an
appropriate education for P.H. The Court finds no reason to
disagree with her decision, particularly because she considered
all the evidence presented to her and because the weights she
assigned to conflicting evidence were undoubtedly influenced by
her educational expertise. See Grim, 346 F.3d at 382
(counseling deference on the sufficiency of educational goals
and strategies); M.C., 226 F.3d at 66 (counseling deference
where "the state hearing officers' review has been thorough and
careful"). The SRO's decision would have merited such deference
had it included consideration of all the evidence in the record.
Accordingly, the Court adopts the IHO's finding that the program
set forth in P.H.'s IEP was substantively inappropriate under
the IDEA.

b.  Inappropriateness of the Classroom

"There is no requirement in the IDEA that the IEP name a specific school location." T.Y., 584 F.3d at 420.  Yet the Court of Appeals has "not h[e]ld that school districts have carte blanche to assign a child to a school that cannot satisfy the IEP's requirements." Id.  Here, Plaintiffs contend that the placement at P.S. 15, which the DOE actually identified for P.H. in its Final Notice of Recommendation (see District Ex. 16 at 1), was substantively inappropriate.  The DOE urges that the Court defer to the SRO's decision, which found P.S. 15 appropriate.

The SRO stated:

[T]estimony by [Jordan] reflected that the classroom was "a very intensive, structured program that [wa]s designed to meet the deficits of autistic children . . . with highly trained professionals[."]  She further testified that the classroom employed the use of various methodologies including TEACCH, ABA, Floor Time and Direct Relationship Interaction (DIR) [methodologies].  She also stated that the class was "a very intensive language[-]based program [in which the student would] be receiving language throughout the entire day in all of his instruction" and that therapists can also push into a classroom to provide services.  Additional testimony by the assistant principal of the recommended school illustrated that the classroom was a 12-month program that offered [occupational therapy], speech-language therapy, [physical therapy], counseling services[,] and a sensory room, and that the recommended school was housed in a general education school which provided opportunities for mainstreaming and inclusion classrooms.  The assistant principal further testified that she had access to an "Autism Coach," that there were "team meetings" to provide for collaboration,

79

that parent training was available, and that a
notebook communication system between school and home
was used to keep the parents apprised of what the
student did each day.  Given the student's special
education needs, I find that the recommended placement
was reasonably calculated to enable the student to
obtain educational benefit.

(SRO Decision 14.)

Again, the SRO's decision is not entitled to deference
because he failed to consider Plaintiffs' methodology evidence
even as he considered the DOE's methodology evidence.  This
error was outcome determinative: his finding that P.S. 15
provided a number of different methodologies does not support
his conclusion that P.S. 15 was appropriate unless those
methodologies were appropriate for P.H.  Plaintiffs presented
substantial evidence by Nicklas and Salsberg, which the IHO
credited, that P.H. could only benefit from 1:1 ABA services.
(See District Ex. 13 at 1; Hr'g Tr. 416:2-422:8, 586:2-588:1;
IHO Decision 16.)  Further, the SRO did not mention Washburn's
admission, which the IHO also credited, that P.S. 15 did not
provide discrete-trial ABA in sufficient amounts for it to be
effective.  (See IHO Decision 16; Hr'g Tr. 814:3-11.)

The Court also notes that the SRO's decision omitted,
without explanation, certain facts that tended to show that P.S.
15 was inappropriate, all of which the IHO considered.  Although
he relied on Cruz's testimony "that the recommended school was
housed in a general education school which provided

80

opportunities for mainstreaming and inclusion classrooms" (SRO Decision 14), the SRO made no mention of Cruz's admission on cross-examination that "[t]he children do not interact with the general education students except in passing in the halls when they go to class; they do not meet in the cafeteria, gym[,] or any other class" (IHO Decision 7; Hr'g Tr. 332:6–343:1). Analysis such as this falls far short of that warranting deference under Gagliardo. Therefore, the SRO's decision is not entitled to deference because, having excluded Plaintiffs' methodology testimony and having failed to explain or distinguish evidence contradicting that on which he relied, the decision was not "thorough and careful." M.C., 226 F.3d at 66.

The IHO's decision, however, is entitled to deference. Her findings with respect to the IEP's substantive violations apply with equal force to the DOE's proposed placement at P.S. 15. She found that P.H. required 1:1 discrete-trial ABA; that 1:1 discrete-trial ABA was ineffective unless provided at least 20–30 hours per week (based on the admission of Washburn, a DOE witness); and that the amount of such instruction P.S. 15 was able to provide was nowhere close to 20 hours. (See IHO Decision 16.) She concluded that P.S. 15 could not provide P.H. with an appropriate education. The Court finds no reason to disturb her analysis. Accordingly, the Court adopts the IHO's conclusion that the DOE substantively violated the IDEA when it

recommended that P.H. be placed in P.S. 15, a school that could
not fulfill his educational needs. Plaintiffs have therefore
carried their burden under Prong I of the reimbursement
analysis.

### 4. Appropriateness of the Unilateral Placement

"New York parents who believe that the state has failed to
offer a FAPE act 'at their own financial risk' when they choose
to enroll their child in a private school." A.D. & M.D., 2010
WL 447371, at *10. Their unilateral placement does not have to
"meet the IDEA definition of a free appropriate public
education." Frank G. v. Bd. of Educ., 459 F.3d 356, 364 (2d
Cir. 2006). It

> need not meet state education standards or
> requirements[; it] need not provide certified special
> education teachers or an IEP[; and it] may not be
> subject to the same mainstreaming requirements as a
> school board. . . . Ultimately, the issue turns on
> whether a placement—public or private—is reasonably
> calculated to enable the child to receive educational
> benefits.

Id. (citations and internal quotation marks omitted).

A child's progress, however, "does not itself demonstrate
that a private placement was appropriate." Gagliardo, 489 F.3d
at 115.

> Indeed, even where there is evidence of success,
> courts should not disturb a state's denial of IDEA
> reimbursement where, as here, the chief benefits of
> the chosen school are the kind of educational and

82

environmental advantages and amenities that might be
preferred by parents of any  child, disabled or not.
A unilateral private placement is only appropriate if
it   provides   education   instruction   specifically
designed to meet the unique needs of a handicapped
child.

Id. (internal quotation marks omitted).

Because the SRO made no specific findings with respect to

the appropriateness of the BAC (see SRO Decision 15 ("I need not

reach the issue of whether the parents' unilateral placement of

the student at BAC was appropriate.")), the Court must defer to

the findings and conclusions of the IHO insofar as they are well

"reasoned and supported by the record." See Gagliardo, 489 F.3d

at 114.  The IHO found that

[t]he parents have shown that the private program has
met the student's special education needs[.]   Dr.
Salsberg testified that the private program is meeting
the student's needs through maintaining data on the
student's performance and adjusting the trials to meet
his specific educational needs.  Ms. Nicklas testified
[that] his behavior has improved[;] he has learned to
express his needs, to ask for help[,] and to
generalize these requests to different teachers.  His
father testified that his son engages in more
spontaneous language, he is more attentive[,] and [he]
stays on task longer.

(IHO Decision 16 (citations omitted).)

The IHO's findings are entitled to deference under

Gagliardo because they are well reasoned and supported by a

preponderance of the evidence.  First, Jaime Nicklas, Dr.

Salsberg, and M.H. testified about P.H.'s performance after

having begun the BAC program.  Nicklas testified that the 1:1

83

discrete-trial instruction provided at the BAC allowed P.H.'s

teachers to tailor their programs to address P.H. specific

deficits.  (See, e.g., Hr'g Tr. 420:7-422:8, 424:12-426:4,

430:11-431:10.)  She explained that the BAC's generalization

program was designed to help P.H. adapt his discrete skills to

other settings and personal interactions.  (See id. at 423:4-8,

426:15-19.)  Dr. Salsberg testified that P.H. "was engaged [and]

reciprocal" and that the BAC teachers were prepared to re-direct

him when he would "go off task."  (Id. at 585:8-15.)  And M.H.

testified that P.H. had in fact made a great deal of progress as

a result of his BAC instruction.  (See id. at 678:5-679:4.)  The

DOE presented no witness testimony or other evidence that

rebutted these opinions.

        Second, the documents the CSE considered also support the

IHO's determination.  Although the opinions of P.H.'s evaluators

conflict to some extent, see supra at 8-10, the IHO considered

all the documents, weighed them based on her educational

expertise, and concluded that a 1:1 discrete-trial ABA program

was substantively appropriate for P.H.  Among the documents that

supported her findings were the report from P.H.'s preschool

teacher (District Ex. 4 (explaining that P.H.'s 1:1 SEIT was the

most crucial part of his school program)), the classroom

observation report from the DOE social worker (District Ex. 7

(explaining that P.H. was highly dependent on his 1:1 SEIT in a

mainstream class setting)), and Dr. Salsberg's psychological addendum (District Ex. 13 (explaining that P.H. "requires 1:1 intensive language-based behavioral interventions by an experienced SEIT throughout the day)). The Court, having no educational expertise, is not in a position to weigh the evidence any differently from the way the IHO did. Therefore, there is no reason to overturn the IHO's finding that placement at the BAC was "reasonably calculated to enable the child to receive educational benefits." Frank G., 459 F.3d at 364.

The DOE identifies three grounds on which the BAC should be considered inappropriate for P.H. None has merit. First, the DOE argues that Jordan's analysis of P.H.'s BAC records shows that the BAC was not actually addressing P.H.'s deficits. Reviewing District Exhibits 21 and 24, Jordan stated it was inappropriate for the BAC to have discontinued P.H.'s handwriting and gross-motor-skills lessons (Hr'g Tr. 98:22-100:10); that it was inappropriate for the BAC to provide a pragmatic-language-skills lesson less than every day (id. at 100:10-101:11); and that P.H.'s increase in undesirable behaviors indicated that the BAC made P.H. feel anxious and uncomfortable (id. at 106:16-25, 108:5-10). Nicklas's testimony largely rebutted Jordan's, however. Though Nicklas admitted that the BAC did not provide a daily lesson in pragmatic language skills, she stated that BAC was nevertheless

implementing that program. (Id. at 527:11-528:19.) She

explained that P.H.'s handwriting lessons were discontinued only

temporarily, and during that time the BAC staff discussed new

strategies with P.H.'s occupational therapy specialist. (Id. at

529:25-530:25.) And she explained that

> when you are working through [problematic] behaviors
> and you're placing some behaviors on extinction,
> children go through what you call behavior[] bursts.
> So the behaviors will become more intense . . . . And
> if everyone is effectively [implementing the
> extinction program], the behavior will peak and then
> it will drop down and . . . will go away.

(Id. at 534:8-22.) Bearing in mind that the parents' placement

is not held to the strict requirements of the IDEA, see Frank

G., 459 F.3d at 364, as well as the Court's responsibility to

give the IHO's decision sufficient deference, A.C. & M.C., 553

F.3d at 171, the Court cannot say that the BAC failed to address

P.H.'s deficits.

Second, the DOE contends that the BAC was not the least

restrictive environment because its program provided only for

1:1 instruction. "IDEA's requirement that an appropriate

education be in the mainstream to the extent possible [is] a

consideration that bears upon a parent's choice of an

alternative placement and may be considered by the hearing

officer in determining whether the placement was appropriate

. . . ." M.S. ex rel. S.S. v. Bd. of Educ., 231 F.3d 96, 105

(2d Cir. 2000) (citation omitted), abrogated on other grounds by

Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49 (2005); see also
20 U.S.C. § 1412(a)(5)(A) (setting forth the requirements for
placement by a school district).  When evaluating whether a
student's placement is the least restrictive environment, "a
court should consider, first, whether education in the regular
classroom, with the use of supplemental aids and services, can
be achieved satisfactorily . . . and, if not, then whether the
school has mainstreamed the child to the maximum extent
appropriate."  P. ex rel. Mr. & Mrs. P. v. Newington Bd. of
Educ., 546 F.3d 111, 120 (2d Cir. 2008).

    The parties have no dispute regarding the first prong of
the Newington test: virtually all the relevant evidence shows
that P.H. would not have benefited from placement in a regular
classroom.  The DOE, however, argues that P.H.'s program at the
BAC was needlessly restrictive because P.H. "received nearly all
of his instruction on a one-to-one basis at BAC and . . . had
little interaction with other students there, disabled or
otherwise."  (DOE's Opp'n Mem. 16.)  This argument, of course,
is only valid under Newington if 1:1 instruction is more
restrictive than is appropriate for P.H.  The record produced in
the administrative proceedings shows that it is not.

    The IHO found that discrete-trial ABA was the appropriate
methodology for educating P.H.  (See IHO Decision 16.)  In
reaching this conclusion, she credited Dr. Salsberg's

                                87

psychological addendum, "which recommended an intensive 1:1[ ]
ABA program." (Id.)  She also credited Dr. Salsberg's testimony
that such a program was particularly effective for P.H. (see
id.) and noted that Elizabeth Washburn, a DOE witness, admitted
that such a program requires 20-30 hours per week of
participation (see id.).  The IHO's determination of this issue
was well reasoned and supported by the evidence, and so there is
no basis for the Court to disagree with her findings.

        Additional witness testimony also supports the IHO's
conclusion.  Dr. Salsberg testified,

        Unfortunately I don't think that there is a less
    restrictive environment [in which] we could make
    appropriate progress.  Again, the literature is pretty
    clear and clinically knowing [P.H.], it's pretty clear
    that he needs the one-to-one . . . to make progress.
    . . . [I]f there were typically developing peers there
    during the day, they would be distracting to him.  He
    would not be using those models in the appropriate
    way.

(Id. at 586:2-12.)  Dr. Salsberg concluded that a less
restrictive environment would not have benefited P.H.  (Id. at
587:21-588:1.)  Although some evidence in the record contradicts
Dr. Salsberg's testimony (see, e.g., District Ex. 11), the IHO
considered all the evidence and credited Dr. Salsberg's
testimony in particular (see IHO Decision 16).  This Court is
not at liberty to weigh the evidence differently from the way
the IHO did.  See, e.g., M.C., 226 F.3d at 66; Gagliardo, 489
F.3d at 114.  Therefore, the Court concludes that the BAC

provided the least restrictive environment that was appropriate for P.H.

Finally, the DOE contends that the BAC was inappropriate because it did not provide any related services to P.H., thereby forcing Plaintiffs to obtain those services from outside specialists.

> To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. They need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.

Frank G., 459 F.3d at 365.

The DOE asserted this argument before the IHO (see Hr'g Tr. 920:21-921:9), who considered the speech therapist's testimony regarding the reduction in P.H.'s related services and its consequences (see IHO Decision 12). Despite this testimony, the IHO nevertheless found that the BAC was an appropriate placement for P.H. (See id. at 16.) Because the parents are entitled to more flexibility in their choice of placement than the DOE, see Frank G., 459 F.3d at 365, the IHO's determination of this issue was consistent not only with the facts but also with the applicable legal standard.

The DOE contends in substance that the IHO's decision was against the weight of the evidence. Yet reversal on such a

basis, if it is ever appropriate, would be inappropriate here.
The IHO's consideration of the evidence was informed by both her
personal observation of the impartial hearing and her
educational expertise. As discussed above, this Court has
neither of those benefits, and so it cannot weigh the evidence
differently from the way the IHO did. See, e.g., M.C., 226 F.3d
at 66; Gagliardo, 489 F.3d at 114.

In sum, all of the DOE's arguments regarding the purported
inappropriateness of the BAC fail for two reasons. First, its
arguments fail because they all ask the Court to evaluate the
parents' placement by the same standards that apply to the DOE's
placement under the IDEA. The Court of Appeals, however, has
stated unequivocally that parents are not held to such stringent
requirements. See Frank G., 459 F.3d at 364. Second, the DOE's
arguments also fail because they ask the Court to reverse the
IHO by reassigning greater weight to evidence that favors the
DOE and less weight to evidence that supported the IHO's
determinations. Assigning new weights to the evidence is
precisely what a court avoids when it conducts a modified de
novo review, particularly where the hearing officer's
educational expertise informed her consideration of the same
body of evidence. See T.P. & S.P., 554 F.3d at 252 (internal
quotation marks omitted). The IHO's opinion shows that she

thoroughly considered both the documentary evidence and the witness testimony in reaching her decision.[18]

For these reasons, the DOE presents no valid reason to reverse the IHO's determination, and the Court finds none. Accordingly, the Court defers to the IHO's decision and concludes that the BAC was an appropriate placement for P.H.

### 5. Equitable Considerations

Although the SRO did not reach the issue of equitable considerations, the IHO found "that equitable considerations support tuition reimbursement [. T]he parents have cooperated with the CSE. They provided private evaluations, participated in the IEP meeting, visited the proposed placement and provided timely notice of their intent to place the student in a private school." (IHO Decision 16.) The IHO stated proper bases for her conclusion, and the Court finds no reason to reverse her determination. The following points, however, bear discussion.

In addition to the IHO's stated equitable grounds for ordering reimbursement, other evidence in the record supports her conclusion. First, uncontroverted evidence shows that the

---

[18] By contrast, the SRO's decision reveals that, far from merely weighing evidence differently, the SRO failed to distinguish, explain, or otherwise analyze certain conflicting evidence in his analysis. (See, e.g., SRO Decision 14 (determining that a 6:1:1 program was more appropriate for P.H. than a mainstream setting, but failing to mention that certain evaluations recommended that P.H. receive some level of 1:1 support).)

DOE was less than forthcoming about the nature of P.H.'s recommended placement. Upon Plaintiffs' repeated inquiries, nobody at the DOE informed Plaintiffs prior to Cruz's testimony at the Impartial Hearing that there was another classroom available for P.H. that would have been more appropriate than Washburn's. (Hr'g Tr. 674:1–675:2.) Although a FAPE does not include the right to a particular brick-and-mortar location, T.Y., 584 F.3d at 419, it does not entitle a school district to play fast-and-loose with the disabled student's placement. Here, in response to M.H.'s repeated inquiries, the DOE identified a particular classroom as being the one in which P.H. would have been placed. (See Hr'g Tr. 674:1–675:2.) Nobody at the DOE informed Plaintiffs that there existed a classroom more appropriate than Washburn's. (See id.) Only after Plaintiffs filed their impartial hearing request did the DOE take the position that the classroom it had previously identified, Washburn's, would not actually have been P.H.'s classroom. (See id.) Notably, no DOE witness testified that the DOE informed M.H. prior to the impartial hearing request that P.H. would have been placed in Motta's classroom. (Id.) Such conduct weighs equitably in favor of reimbursement because it reflects a disingenuous attitude toward the DOE's obligation to provide P.H. with an appropriate education in the first place.

Without citation to the hearing transcript or the parties'
exhibits, the DOE asserts that Plaintiffs "raised no concerns
about the IEP at the IEP team meeting [and did not] contact the
DOE after the meeting to notify the DOE of any issues with the
IEP." (DOE's Opp'n Mem. 19.) This assertion tracks the
relevant language in the SRO's decision. He stated:

> [T]here is no indication in the hearing record that
> any of the members of the CSE were denied the
> opportunity to meaningfully participate in the review
> of the student. Furthermore, the hearing record does
> not indicate that the parents notified the CSE of any
> concerns about the goals for the student at the CSE
> meeting, and the hearing record does not indicate that
> the parents notified the district of any concern about
> the goals until the time at which they filed their due
> process complaint notice dated October 30, 2007,
> despite the fact that they received the IEP no later
> than when they received the FNR dated July 11, 2007.

(SRO Decision 14.) Yet the hearing record demonstrates that
these assertions, aside from being partly incorrect, do not tell
the full story of Plaintiffs' interactions with the DOE.

First, the hearing record does in fact indicate that
Plaintiffs were denied a meaningful opportunity to participate
in the CSE meeting. M.H. testified that he shared his concerns
about the IEP at the CSE meeting, particularly with respect to
"the speech element." (Hr'g Tr. 651:4-15.) He stated that, in
response, "there was just a lot of pushback." (Id. at 651:18-
21.) He also stated that he expressed his concern that the IEP
did not accurately reflect the evaluation results Plaintiffs

provided to the CSE.  (Id. at 653:4-654:11.)  This testimony belies the assertions by the DOE and the SRO that Plaintiffs failed to raise their concerns about the IEP at the CSE meeting.

Second, the DOE's assertion entirely sidesteps the large portions of both the hearing record and the IHO's decision that explain that Plaintiffs' had greater concerns about P.S. 15 than about the IEP.  M.H.'s testimony summarizes this point.  After stating that Jordan responded to his views with "a lot of pushback" (id. at 651:18-21), he concluded: "I said I would be totally open to whatever placement they recommended, but I was definitely concerned about [P.H.] being able to function in that kind of a[n] environment without sort of the robust or continuation of [his] current level of services."  (Id. at 654:5-11.)  As the IHO noted, M.H. gave a detailed account of his numerous, often futile attempts to learn about the DOE's proposed placement.  (See IHO Decision 13-14.)  The DOE presented no witness testimony or documents to rebut any part of M.H.'s testimony regarding his investigation of P.S. 15.  Thus, Plaintiffs' unrebutted testimony shows that the DOE consistently stonewalled M.H.'s inquiries into the appropriateness of P.S. 15.  (See id.)  The DOE's assertion, therefore, is partly incorrect and omits many relevant facts regarding the parties' conduct.  The record shows that Plaintiffs expressed their concerns; the DOE simply refused to listen.

The DOE also contends that Plaintiffs demonstrated their
unwillingness to consider a public-school placement when they
signed P.H.'s enrollment contract with the BAC. Specifically,
it asserts that

> they signed a contract with BAC, made a non-refundable
> $40,000.00 payment to BAC, and committed to paying BAC
> $80,000.00[,] and only then notified the DOE that they
> were withdrawing [P.H.] from public school and would
> be seeking reimbursement for the tuition costs. This
> indicates that the Plaintiffs were not interested in a
> public school placement.

(DOE's Opp'n Mem. 19.) The parties dispute whether this
accurately characterizes Plaintiffs' actions. Plaintiffs assert
that the nonrefundable portion of the down payment was only
$1,000.00. Further, the IHO stated "that at the beginning of
August[, Plaintiffs] stated to explore other schools, both
public and private." (IHO Decision 13 (emphasis added).) This
dispute over the down-payment cost, however, is immaterial
because Plaintiffs' actions took place only after the DOE began
stonewalling their inquiries into the appropriateness of P.S.
15.

The record reveals that Plaintiffs were trying to learn
anything they could about P.S. 15 but were nevertheless under
pressure to ensure that P.H. was enrolled in an appropriate
school on a timely basis. The IHO's decision explains M.H.'s
testimony in detail:

     Three months after the CSE meeting, in July,
[M.H.] received from the CSE the final notice of
recommendation for placement [at P.S. 15]. He
contacted the school, left messages, but to no avail.
He followed up with other DOE numbers and after three
weeks he got a call from the principal of the proposed
program and arranged to visit the site. In early
August, he and his wife visited the main site and
observed a class; chatted with a head teacher. The
class had very low functioning children with very
little expressive language. It appeared to him that
they were just babysitting the children[;] there was
very little educational instruction. He e[-]mailed
the principal expressing his various concerns and
requested a class profile. She responded[,] informing
him [that] there would be two classes and the children
would be sorted out[,] and she referred him to a Ms.
Royster, in placement. Ms. Royster never returned his
call or responded to the follow[-]up letter.

     The father testified that at the beginning of
August they started to explore other schools, both
public and private. Subsequently, they went to the
child's current school to learn about its program[.
T]hey spoke to teachers and prospective parents. He
submitted an application for the school[,] and the
following day he went to see Ms. Royster and waited an
hour and a half to see her. Also, he met with Mr.
Bas[s]is[. N]either w[as] able to provide any
information about the students for the [DOE's]
proposed class. These meetings took place on August
24th, 2008[, two weeks before school was to begin].

     The father testified that he signed the private
school's contract on August 17th[;] however[,] he
acknowledged that on some parts of the contract he
mistakenly wrote July 17th. He stated that even after
signing the contract he still pursued the DOE
regarding the public school placement[. H]e followed
up with Ms. Schuster on September 10th because she had
told him [that] after school started he could observe
the class. She responded on September 19th[, more
than one week after school had begun,] and the next
day he went to observe the recommended class. Ms.
[C]ebrian took him to observe [Washburn's] class[, who
told him afterward that P.H.] would be in Jackie's
class. He went back to Ms. [C]ebrian to follow up on

                           96

Jackie's class; Ms. [C]ebrian told him Jackie's class
consisted of older children and [that] it would not be
appropriate for [P.H].

        The father noted that [Washburn's] class . . .
was far below his son's cognitive abilities[;] the
children had behavioral issues[;] they were completely
non[-]verbal[;] and two of the four children were
wearing diapers.  Moreover, these children were not
going to be good role models.  The PEC system was
being used, [and P.H.] was too advanced for that
system and would [have] be[en] bored by it.

(Id. at 13-14.)

        The DOE did not rebut any of this testimony.  The IHO found

that equitable considerations weighed in favor of reimbursement,

and the discussion set forth above provides abundant support for

her conclusion.  Accordingly, the Court defers to the IHO's

discussion of this issue and concludes that the DOE's assertion

that Plaintiffs were not interested in a public-school placement

is not supported by the evidence in the record.

        The DOE also asserts that the $80,000 cost of P.H.'s BAC

tuition is unreasonable and thereby constitutes a basis for

denial of reimbursement under Carter, 510 U.S. at 16.  Carter

instructs that "[c]ourts fashioning equitable relief under IDEA

must consider all relevant factors, including the appropriate

and reasonable level of reimbursement that should be required.

Total reimbursement will not be appropriate if the court

determines that the cost of the private education was

unreasonable."  Id.

Here, the IHO found that P.H. required 1:1 discrete-trial ABA services. (See IHO Decision 16.)  Individual services, of course, would be expected to cost more than classroom instruction because the student-teacher ratio is lower.  This is particularly true in a place with a high cost of living, such as New York City.  The IHO was undoubtedly aware of this cost when she ordered the DOE to reimburse Plaintiffs for the $80,000 cost of P.H.'s tuition.  Had the DOE provided a FAPE in the first place, it would have had to incur the costs associated with 1:1 educational services.  As the Supreme Court of the United States explained during the same discussion in Carter,

> [t]here is no doubt that Congress has imposed a
> significant financial burden on States and school
> districts that participate in IDEA.   Yet public
> educational authorities who want to avoid reimbursing
> parents for the private education of a disabled child
> can do one of two things: give the child a free
> appropriate public education in a public setting, or
> place the child in an appropriate private setting of
> the State's choice.

510 U.S. at 16.  Here, the DOE does not ask the Court to consider any new evidence that was not before the administrative officers.  Rather, it asks the Court, without providing any legal analysis, to find that P.H.'s $80,000.00 tuition is unreasonable per se.  This request, apart from being unpersuasive, ignores the Court's obligation to afford the hearing officer's decision the deference it is due.  See, e.g., Gagliardo, 489 F.3d at 113.  Therefore, the Court defers to the

IHO's conclusion that $80,000.00 was not an unreasonable reimbursement request given the IHO's determination that an appropriate education for P.H. required 1:1 ABA services.

In short, the IHO correctly found that the equities weigh in favor of reimbursement. The administrative record, and particularly the transcript of the impartial due process hearing, shows in graphic detail that the DOE gave M.H. and E.K. the runaround during every step of the IDEA's statutory process. Having requested that Plaintiffs provide the CSE with reports from independent evaluators, Giselle Jordan disregarded nearly all of those evaluators' recommendations in favor of her own predetermined plan, despite her never having observed P.H. personally. Having offered to provide Plaintiffs with information regarding P.S. 15, its recommended placement for P.H., the DOE stonewalled all of Plaintiffs' inquiries regarding the program until more than one week after the school year began. And having given Plaintiffs conflicting information about the class in which P.H. would have been placed, the DOE then surprised Plaintiffs at the impartial hearing with yet another class that would purportedly have been appropriate for P.H. Cavalier conduct such as this comports with neither the letter nor the spirit of the IDEA and is inequitable in any event. Under these circumstances, the Court has no trouble finding that the IHO correctly weighed the equities in this

case.  Accordingly, Plaintiffs are entitled to reimbursement of

P.H.'s tuition in the amount of $80,000.00 for the 2007-2008

school year.

IV.  CONCLUSION

     For the reasons set forth above, Plaintiffs' motion [dkt.

no. 12] is GRANTED, and the DOE's motion [dkt. no. 18] is

DENIED.  The Clerk of Court shall mark this case CLOSED and all

pending motions DENIED as moot.

SO ORDERED:

DATED:    New York, New York
          May 10, 2010

<br>

LORETTA A. PRESKA, Chief U.S.D.J.